## WILKIN-HALE BANK v. HERSTEIN.

No. 3887. Opinion Filed June 8, 1915.

Rehearing Denied July 6, 1915.

(149 Pac. 1109.)

1. **BANKS AND BANKING—Authority of President.** The affairs and business of a banking association under section 283, Comp. Laws 1909 (Sec. 262, Rev. Laws 1910), are managed and controlled by the board of directors. The statute is silent as to the duties of the president. He is, however, the presiding member of the board of directors, and may be delegated the authority of exercising personal supervision over the affairs of the bank; if such authority is not delegated to him, he has only such authority as is inherent in the office itself.

2. **SAME—Misconduct of President—Liability of Bank.** Where the president of a bank, while purporting to act in such capacity, engages in a fraudulent transaction entirely without the scope of his general or delegated powers, by which he obtains the property of another, but of which transaction the directorate has no knowledge, and from which the bank derives no benefit, and which is in no manner ratified by the board of directors, the bank is not bound thereby and is not liable in damages for any injury arising therefrom.

(Syllabus by Bleakmore, C.)

*Error from District Court, Oklahoma County;*
*Geo. W. Clark, Judge.*

Action by Bernie Herstein against the Wilkin-Hale Bank, formerly the Night & Day Bank. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

*Ledbetter, Stuart & Bell,* for plaintiff in error.

*Giddings & Giddings,* for defendant in error.

Opinion by BLEAKMORE, C. This action was commenced in the district court of Oklahoma county on the 22d day of April, 1911, by Bernie Herstein, as plaintiff,

against the Night & Day Bank, Abner Davis, and A. Lorenze, as defendants, seeking recovery of the value of certain promissory notes alleged to have been procured by defendants from plaintiff and the Turner Mercantile Co. by means of fraudulent pretense. The action was subsequently dismissed as to Davis and Lorenze. During the pendency of the action the name of the defendant Night & Day Bank was changed to Wilkin-Hale Bank. The case was tried to the court, and resulted in judgment for plaintiff. The parties will be referred to as they appeared in the trial court.

The facts as disclosed by the record are: That the Night & Day Bank, having a capital of $25,000, was doing a general banking business at Oklahoma City; that Abner Davis, its president, owned $22,000 of the stock. At some time during the year an increase of the capital stock of said bank from $25,000 to $50,000 was duly authorized, and the stock issued, the whole amount being purchased by Abner Davis. Thereafter Abner Davis wrote the following letter to the Turner Mercantile Company (written on Night & Day Bank letter head):

"OKLAHOMA CITY, AUG. 15, 1910.
"Turner Mercantile Co., Indianola, Oklahoma—Gentlemen: On the 2d of last June, we had a letter from you in answer to a letter of ours of May 31st, with reference to you investing in our bank stock. We have heard nothing further from you since, and as we decided not to place the stock which we were then offering, took it off the market. At this time, however, we are again confronted with the proposition of increasing our capitalization to $100,000. This we are compelled to do in order to comply with the banking laws of the state, which on account of the large deposits we have, by now going toward the half million dollar mark, and the population of the city have reached the point where, as above stated, will compel us

to take this step. We are therefore offering the stock to influential and leading business men in the different cities covering this territory so as to make the Night & Day Bank, in its stockholders' way, what the people have made it in depositors' way, namely a bank of the people. We today have over 4,000 depositors and are increasing at so rapid a pace that no other bank in this city has ever made such a record in the past and is not likely to do this in the future. If you are interested we would be pleased to hear from you on the inclosed addressed envelope and as the stock we are offering amounts to but a limited amount, we would suggest that you act quickly and if you prefer, Mr. Lorenze, who has charge of the stock issues for the bank, may have occasion to come to your city in the next few days and will be pleased to call on you for a personal interview. We may frankly say to you that were we to desire to sell the stock, that we can get a much larger price from parties in this city, who are aspiring the control of it, than we are getting from our friends through the state, as the stock to you will be sold at par without any premium, while on the other hand a bank of the magnitude of our bank with more than over 4,000 depositors and reaching the half million deposit mark, any shrewd business man must understand that the growing business itself is worth 100 per cent. premium from a point of a permanent and profitable investment.

"Thanking you for an early reply, and awaiting your immediate answer, we remain,

"Sincerely yours,

"ABNER DAVIS, *President.*"

Thereafter A. Lorenze, the person referred to in said letter, called upon the plaintiff, who was the president of the Turner Mercantile Company, at its place of business at Indianola, Okla.; and, relying upon the representations contained in said letter, plaintiff, on behalf of the mercantile company and for himself, entered into the following contract:

"INDIANOLA, OKLA., 11/1/10.

"To Whom It May Concern: This is to certify that Turner Mercantile Company, Bernie Herstein, and A. Lorenze, representing the Night & Day Bank of Oklahoma City, have entered into the following agreement: Bernie Herstein has subscribed 10 shares of stock in the above-mentioned bank and Turner Mercantile Company 10 shares of stock in said bank, said amount of $2,000 being payable January 1, 1911.

"A. Lorenze, representing said bank, being their authorized agent, agrees to take over sundry notes representing land sales and secured by land, and bearing the indorsement of Turner Mercantile Company, to be discounted at a net rate of 8 per cent. per annum and 2 per cent. commission for sale of same. Balance of said stock, if any remaining, shall be paid in cash to make out the $2,000.

"TURNER MER. CO.,
"BERNIE HERSTEIN, *Prest.*
"BERNIE HERSTEIN.
"A. LORENZE."

Pursuant to said contract, about December 20, 1910, plaintiff forwarded by registered mail to Abner Davis, president of the Night & Day Bank, negotiable notes amounting to approximately $2,000, and two checks, one for $281.50 and one for $218.50, which were received by him and remained on his desk for some days. The check for $218.50 disappeared and was not heard of again. In some manner, not disclosed by the evidence, Lorenze acquired possession of the notes and was holding them for commissions claimed by him to be due on the sale of the stock of defendant bank. All the statements and representations contained in the letter and made by Lorenze which induced the making of said contract and the delivery of the notes and checks to the president of the bank were false. The bank had not been compelled

or authorized to increase its capital stock, no action had been taken by its stockholders looking to such increase, and no certificate showing compliance with the statute in this respect had been filed with the bank commissioner. Such representations were unquestionably made by Abner Davis, purporting to act as president of the bank, for the fraudulent purpose of obtaining the notes and checks of plaintiff as the purchase price in a pretended sale of stock which the bank had not issued and did not contemplate issuing.

Prior to the contract for the purchase of stock in question, plaintiff and the Turner Mercantile Company had subscribed for $1,000 of the stock of defendant bank actually issued when its capital was increased from $25,000 to $50,000, and had paid the money therefor to Abner Davis, as president. That stock had not been delivered; but the $1,000 had been deposited to the credit of the stock or subscription account in the bank.

On the 29th of December following, plaintiff demanded of Abner Davis, as president of the bank, the performance of the contract, on the part of the bank. This was refused.

In this regard plaintiff testified:

"Q. Who did you make the demand of? A. Abner Davis. Q. Where was he then? A. In the bank, Night & Day Bank. Q. Was he still in charge of the Night & Day Bank? A. Yes, sir. Q. What, if anything, did he say, Mr. Herstein? A. Why, he said, 'We have decided not to issue the stock, and I will return the money.' He says, 'It has been placed to the credit of the stockholders' account, and I will return what it shows there as a credit from your payments,' which was $1,281.50, he said, and he said he had turned over the other check and the notes to Mr. Lorenze, and Lorenze had them, but he was, at

that time, he said, in Milwaukee, but would return within a day or two and he would get these notes and this check and return them to me. Q. He said there was to your credit $1,281.50? A. To the credit of the stockholders' account as paid by me. Q. What constituted that $1,281.50? A. It constituted the payment I made on the first purchase of stock and $281.50 which I paid on the second purchase of the stock. Q. Did you ever get that stock? A. No, sir. Q. Did they pay you back the $1,000 you sent them in settlement of your note given for the stock? A. Yes, sir. Q. And paid you the $281.50? A. Yes, sir."

It was stipulated by the parties:

"The books of the Night & Day Bank show that on the 29th day of December, 1910, the Turner Mercantile Company was credited on the books of the bank with the sum of $1,281.50, the deposit slip showing that this $1,281.50 was made up of the following two items: First, subscription $1,000; second, check from Indianola, $281.50."

The directors and cashier of the bank testified that they never saw the notes in question and were unaware of any transaction between the plaintiff, the Turner Mercantile Company, and Abner Davis and Lorenze, and that neither Davis nor Lorenze was authorized to act for the bank in such transactions.

Prior to the bringing of the suit the interest of the Turner Mercantile Company was assigned to plaintiff.

Section 261, Rev. Laws 1910, provides:

"The capital stock of any banking association doing business under the laws of this state may be increased or decreased at any time by resolution adopted by three-fourths of its stockholders, at any regular meeting or at a special meeting called for that purpose, of which all stockholders shall have due notice, in the manner pro-

vided by the by-laws of such banking association. A certificate must be filed with the bank commissioner by the chairman and secretary of the meeting, and by a majority of all the directors, 'showing the compliance with the provisions of this section, the amount to which the capital stock has been increased * * *, the amount of stock represented at the meeting, and the vote upon the question to increase or decrease the capital stock. No such changes in the capital stock at any such association shall be valid or binding until the same shall have been approved by the bank commissioner."

The affairs and business of a banking association under section 262, Rev. Laws 1910, are managed and controlled by the board of directors. The president is selected from among their number; but the statute is silent as to his duties. In Michie on Banks and Banking, section 102 (5b) it is said:

"The president of the bank is generally, if not always, a member of the board of directors, and chosen by the board from their own number. He is expected to preside at meetings of the board of directors, and ordinarily the position is one of dignity and of indefinite general responsibility rather than of any great and accurately known power. He is usually expected to exercise a more constant, immediate, and personal supervision over the daily affairs of the bank than is required of any other director; but the authority inherent in the office itself is very small, and it is difficult to say precisely how or where it is much in excess of that which can be exercised by any other single director. Indeed, it is said that the entire collection of judicial authorities justifies the enunciation of only one function as falling within the properly inherent power of the president, viz., to take charge of the litigation of the bank * * * , but while powers inherent in the office of president are very few, he may be authorized by the directors to do anything within the authority of the bank's charter which the directors themselves might do, except such positive duties as the charter makes personal

to the directors, and which cannot be delegated.   *   *   *
In order that the circumstances of a particular case may
be sufficient to raise the presumption of authority in a
bank president to bind the bank in matters beyond the
usual scope of his authority, the bank must in some man-
ner be a party to the circumstances, or must be charge-
able with knowledge of them.   *   *   *   The president
has no power to bind the bank except in the discharge of
his ordinary duties."

Again, it is said by the same author, section 102 (1) :

"For acts and contracts not within the general scope
and sphere of agents' duties, the bank is not liable unless
there has been a previous special authority or a subse-
quent ratification."

It is clear that the bank derived no benefit by reason
of the receipt by Abner Davis of the notes and checks
involved herein in the course of his dealings with the
plaintiff and the Turner Mercantile Company.   The $218.50
check disappeared and was not cashed, the notes were
never in its possession, and the check for $281.50 dated
Indianola, Okla., December 20, 1910, was deposited to
the credit of the mercantile company by Davis, president
of the bank, on the 29th day of December, 1910, together
with the $1,000 which had theretofore been paid to him
by virtue of the former attempted purchase of stock, and
the whole amount subsequently withdrawn by the plain-
tiff.   It will be remembered that the contract by the
mercantile   company   and   the   plaintiff   with   Lorenze
under   the   terms   of   which   the   two   checks   and   the
notes were forwarded to Abner Davis, president of the
bank, was entered into at Indianola, Okla., away from de-
fendant's place of business.

The bank was in no way a party to the transaction,
either by having authorized the pretended increase of its

capital, or by doing any act that might be construed as evidencing an intent to increase the same or to empower its president or any one else to solicit subscriptions to any contemplated increase of its stock. Every act of its president in his dealings with the plaintiff was obviously entirely without the scope of his general powers as an officer and agent of the bank under the laws of this state. Abner Davis, as president of the defendant bank, had no authority under the law or by virtue of any act of its directorate to bind the bank by the transactions in question. The board of directors had no knowledge of such unauthorized acts, and therefore could not have ratified them. *Western National Bank v. Armstrong*, 152 U. S. 346, 14 Sup. Ct. 572, 38 L. Ed. 470.

The evidence is wholly insufficient and does not reasonably tend to support the judgment. It follows, therefore, that the judgment of the trial court should be reversed and the cause remanded.

By the Court: It is so ordered.