## FARMERS' STATE GUARANTY BANK v. CROMWELL.

No. 8262—Opinion Filed June 25, 1918.

(173 Pac. 826.)

**1. Banks and Banking — Duties of State Bank Officers—President—Cashier.**

The affairs and business of a state banking corporation, under section 262, Rev. Laws 1910, are managed and controlled by its board of directors. The statute provides for the selection and qualification of the president and cashier, but does not prescribe their repective duties; in the absence of specific delegation these officers only have such authority as is inherent in the respective office itself.

**2. Acts of President and Cashier—Scope of Authority—Liability of Bank.**

Where a prospective purchaser of stock in a bank goes to the cashier and president of the bank, and makes inquiry as to the condition of the bank, and as to the value of the stock, and is misled and deceived by the information given, and sustains loss on account thereof, in the absence of a showing of specific authority to make such representations, the bank cannot be held liable for the reason that the officers were acting without the scope of their authority in giving the information relied upon.

(Syllabus by Galbraith, C.)

Error from District Court, Custer County; Thos. A. Edwards, Judge.

Action by the Farmers' State Guaranty Bank against C. E. Cromwell. Judgment for defendant, and plaintiff brings error. Reversed and remanded, with directions to grant a new trial.

Geo T. Webster, for plaintiff in error.

Massingale & Duff, for defendant in error.

Opinion by GALBRAITH, C. The plaintiff in error, as plaintiff in the trial court, commenced an action against the defendant in error, as defendant, to recover on a promissory note for $1,360, with interest from August 9, 1914, and attorney's fee of $100.

The answer was a general denial, and the affirmative defense of failure of consideration and fraud and deceit on behalf of the plaintiff, in this, that the note represented the purchase price of eight shares of the capital stock of the plaintiff bank, which the defendant purchased from a third party by the name of Ross, but, before purchasing, the defendant advised with the cashier of the plaintiff and its president in regard to the value of the stock, and was misled by the advice falsely and fraudulently given, and was thereby led to believe that the stock was of great value,

and purchased the same, when as a matter of fact it was worthless then as it afterwards proved to be. The cause was tried to the court and the jury, and a verdict returned for the defendant. On the denial of a motion for new trial, the judgment rendered was brought here for review.

A number of errors are assigned, one in the denial of the motion to direct a verdict, and another, errors in the admission of testimony.

The controlling facts, as disclosed by the record, are as follows: The plaintiff in error is a state banking corporation, located at Thomas, Custer county, Okla. At the time of the execution of the note in suit its cashier was one Garner and its president was one Huston. The defendant in error was a customer of the bank, but not a stockholder, and was engaged in the drug business in Thomas He was indebted to the bank, as evidenced by his promissory note, in the sum of $2,100. Cromwell arranged with a man by the name of Ross to buy his interest in the drug store, provided the stock in the plaintiff bank would be accepted in payment thereof; Ross proposing to transfer eight shares of stock at the valuation of $162 each in consideration for Cromwell's interest in the drug store. Cromwell agreed to accept the stock, provided he could satisfy himself that it was worth the money that Ross asked for it. His testimony in regard to what he did to inform himself of the value of the stock is all the testimony on this point in the record, and is as follows:

"Q. Now, referring to the transaction at the time you took the assignment over from Ross, tell the jury what was said with reference to the bank taking your note for part of the Ross stock? A. I told them that I would have to give them my note for it; intended to give my note to them for the eight shares of stock. Q. Who was you talking to at that time? A. I was talking to Mr. Garner. Q. What did Mr. Garner say with reference to that adjustment of the notes? A. He said it was—it would be all right. Q. What further was said at that time between you and Mr. Garner? A. I asked the value of the stock, what it was worth. Q. What did he say? A. He figured out the stock was worth $1.83. Q. How did he figure it out? A. He took the building, capital stock, fixtures. Q. What other statement, if any, did he make? A. Well before that he said the stock was selling at $1.50, but he said that it was actually worth $1.83. Q. Is that all he said? A. No, I asked him in regard to bad paper in the bank; he said there was a small amount in there. I asked him the amount of it; he said about $2,500. Q. Did he make any reference to the note he considered bad paper? A. He did. Q.

What paper did he name? A. He said the Bank of Taloga note for $2,500. Q. Did he name any other note as being bad? A. No, sir. Q. Have you told the jury all John Garner said on that occasion? A. I was telling him what I was going to do, and why I came to see him, and what I was contemplating doing and I wanted to find out the condition of it, whether it was a profitable investment, and he said it was, he said the bank stock would pay out itself there at the bank. Q. Did he say anything more about the bad paper? A. No; he did not. Q. What did he say, if anything, with reference to the undivided profits? A. He turned to Mrs. Combs, and asked her what the undivided profits was. She told him $3,500. She turned to the book and found out it was right about $3,500. He said the undivided profits would more than cover the bad paper. Q. Well, is that all he said at that time? A. Well, we were talking there quite a while that evening—I do not remember whether it was evening or not—it was that day. Q. Where was Ross at that time? A. He was over at the drug store."

The witness further testified in regard to the conversation with the president of the bank as follows:

"Q. Did you ever talk with any other officer of the bank with reference to its condition during that period of time? A. I talked with Mr. Huston once about the time I was making the trade, at several times with Mr. Huston. Q. Where was Mr. Huston when you talked to him? A. He was at the drug store. Q. Did you consult him about the condition of the bank to inform yourself about the value of this stock prior to the time you closed your deal with the bank? A. I did. Q. Where did you see John Huston at that time? A. He was at the drug store. Q. What did John Huston say? A. He said the stock was worth $1.62, well worth it. Q. And that was in regard to the value of the stock; that was prior to the time you bought? A. Yes, sir."

This witness testified that, relying on these representations of the cashier and the president of the bank, he made the deal with Ross, and executed his note for the purchase price, being the note in suit, but by an arrangement between Ross and himself and the bank the note was executed to the bank and in the transaction he took up his $2,100 note the bank then held against him; that afterwards an assessment against the capital stock of the bank of 100 per cent. was made; that he refused to pay the assessment, and his stock was sold, and he did not receive anything for it. There was no evidence to show that the cashier and the president of the plaintiff were clothed with any other powers than those prescribed for such officers under the state banking law.

At the close of the evidence a motion was presented to direct a verdict for the plaintiff, and denied, and this is assigned as error.

It is argued in support of this assignment that it appears from the defendant's testimony that the officers of the bank were acting without the scope of their authority in giving the information to Cromwell, even if they did make the representations as he contends, and that he was misled and deceived thereby, and sustained the loss claimed and that the bank is not liable; that it is no part of the duties of the president and cashier to give out information as to the financial condition of the bank, or to advise as to the value of its stock, and that they have no authority to pass out such information to customers who were not stockholders or directors of the bank; and, if they did so, it was simply a gratuitous service, and did not create any liability on the part of their principal, the bank.

Section 262, Rev. Laws 1910, provides, in part, as follows:

"The affairs and business of any banking association organized under the laws of this state shall be managed and controlled by a board of directors of not less than three or more than thirteen in number, who shall be selected from the stockholders, at such time and in such manner as may be provided by the by-laws of the association. * * * The board shall select from among their number the president and secretary, and shall select from among their stockholders a cashier. Such officers shall hold their offices for a term of one year and until their successors are elected and qualified. The board shall require the cashier and any and all officers having the care of the funds of the bank to give a good and sufficient bond, to be approved by them, and held by the state banking board. The board of directors shall hold at least two regular meetings each year, and at such meetings a thorough examination of the books, records, funds, and securities held by the bank shall be made and recorded in detail upon its record book, and a certified copy thereof shall be forwarded to the bank commissioner and to each stockholder of record within ten days."

In Wilkin-Hale Bank v. Herstein, 48 Okla. 628, 149 Pac. 1109, the first paragraph of the syllabus reads:

"The affairs and business of a banking corporation under section 283, Comp. L. board of directors. The statute is silent as to the duties of the president. He is, however, the presiding member of the board of direc-

tors, and may be delegated the authority of exercising personal supervision over the affairs of the bank; if such authority is not delegated to him, he has only such authority as is inherent in the office itself."

In that case the president of the bank made fraudulent representations as to the value of the stock of the bank, and induced defendant to purchase it, and the court held that, inasmuch as the bank had not authorized him to make such representation and had no knowledge of his unauthorized acts, the same were without the scope of his authority as president, and the bank was not bound thereby.

The Supreme Court of Alabama announces the rule in Singer Mfg. Co. et al. v. Taylor, reported in 150 Ala. 574, 43 South. 210, 9 L. R. A (N. S.) at 929, 124 Am. St. Rep. 90, as follows:

"The liability of the principal for the torts of the agent, when not based upon a breach of duty arising out of contract, as in the case of common carriers, is based upon principles of public policy. It is essential to such liability that the tort of the agent, if not authorized or ratified by the principal, should be committed by the agent in the course of the business of the principal and of the agent's employment."

A case in point is Commercial National Bank of Beesville v. First National Bank of Cuero, 97 Tex. 536, 80 S. W. 601, 104 Am. St. Rep. 879, where the Cuero bank sought to hold the Beeville bank liable for the loss sustained by it on account of the forgery of a signature to a note, which it had accepted upon the representation of the cashier of the Beeville bank that the signature was genuine The court in denying the liability of the Beeville bank say that the facts do not show a transaction embraced in the provisions of the banking law, but do show that it was a matter in which the Beeville bank was not interested, and was a mere courtesy between the officers of the two banks, performed gratuitously by the cashier of the Beeville bank for the accommodation of the officers of the Cuero bank, to aid them in making a loan.

In United States v. Bank of Columbus, 21 How. 356, 16 L. Ed. 130, the cashier of the defendant bank gave to one of its directors, Mr. Minor, a statement that he was authorized on behalf of the bank to "contract with the Treasury Department of the United States for the transfer of money from the east to the south and west for the government," and upon the force of the statement of the cashier the Secretary of the Treasury contracted with Mr. Minor for the transfer of $100,000 from New York to New Orleans. Minor received

and cashed the draft, but the government did not receive the money at New Orleans. The United States brought suit against the Columbus bank, alleging that it was liable for the loss on account of the letter its cashier had given to Minor. The United States Supreme Court held that the cashier had no authority to make such representations on behalf of the Columbus bank, and that it was not liable for the loss sustained in consequence of the reliance upon the false statement.

In Crawford v. Boston Store Mercantile Co., 67 Mo. App. 39, a firm of merchants secured from the cashier of a bank a statement to the effect that the firm was "solvent and would pay for all that they would buy." Upon this statement the firm obtained credit, and, having failed in business, it was sought to hold the bank responsible for the loss. The court held that the cashier had no authority to give such a statement, and therefore the bank was not liable for the damage.

Likewise the representations of Garner, the cashier, and Huston, the president, as to the value of the stock in the plaintiff bank, and as to the bank's business condition, even if made, as contended by Cromwell, were not made in the line of their duty as officers of the bank, and were not within the scope of their authority as president and cashier, and the bank was not liable therefor. The defendant's evidence shows that the things relied upon to defeat the recovery on his note were mere personal transactions, not concerning the business of the bank, and that liability, if any resulted therefrom, rested upon the officers and not upon the bank. It is no part of the duty of the bank cashier to pass out, gratuitously or otherwise, to prospective purchasers of stock in the bank. information as to the financial standing of the bank, or to advise as to the value of its stock, nor is it any part of the duty of the president of the bank to advise such persons as to the value of the stock. The record does not show that either the cashier or president was authorized to make representations of this kind or character, or that the board of directors had any knowledge that they had made such representations, and for that reason there can be no grounds for the contention that the wrongful acts of the officers had been ratified by the directors. Lamon v. Speer Hardware Co., 198 Fed 453, 119 C. C. A. 1; Federal Trust Co. v. Coyle, 34 Okla. 635, 126 Pac. 700; Cargile v Union State Bank, 40 Okla. 506, 139 Pac. 701.

In this view of the case it will not be necessary to consider the other assignments

of error, and particularly those urged in regard to the admission of letters from the banking department to the bank criticizing the management of the bank. These letters were doubtless incompetent upon the theory they were admitted; but, as we view the case, the condition of the bank and the representations in regard to it can have no possible relevancy under the law of the case as herein declared.

On account of the error in refusing to direct a verdict for the plaintiff, the case is reversed, and the cause remanded, with directions to the trial court to grant a new trial.

By the Court: It is so ordered.