David Stoneman, of Boston, Mass. (S. Sidney Stoneman, of Boston, Mass., on the brief), for appellant.

Brenton K. Fisk, of Boston, Mass. (Andrew J. Aldridge, of Boston, Mass., on the brief), for appellees.

Before WILSON, Circuit Judge, and PETERS and MAHONEY, District Judges.

## CLARK v. DEITRICK.

### No. 3424.

Circuit Court of Appeals, First Circuit.

June 30, 1939.

MAHONEY, District Judge.

This cause was tried before a jury in the District Court in and for the District of Massachusetts, and at the close of the testimony, the court granted the defendant's motion for a directed verdict. The plaintiff then appealed from the judgment which was entered on the verdict.

The action is one at law for deceit, brought against the defendant bank and its receiver. It is based on fraudulent misrepresentations made to the plaintiff by the president of the bank prior to its closing and to the appointment of the receiver.

The declaration recites that the plaintiff is a citizen of Massachusetts with an usual place of business in Boston, in the District of Massachusetts, and that the defendant is a national banking association with its

usual place of business in Boston. It then alleges:

That on December 16, 1931, the defendant, Boston-Continental National Bank, closed its doors in the regular course of business and did not open thereafter, and on December 17, 1931, J. W. Pole, the Comptroller of the Currency of the United States, took possession of the assets of said bank for the purpose of winding up its affairs; that thereafter said Comptroller of the Currency appointed a receiver of said bank and that the defendant, Frederick S. Deitrick, has succeeded to the office of receiver, has duly qualified as receiver by giving bond, and is now in possession of the books, records and assets of said bank and is acting as receiver.

That in the spring of 1931 the plaintiff was the owner of a considerable number of shares of the capital stock of the defendant bank, which shares he had purchased during and subsequent to 1928.

That for some time prior to the spring of the year 1931 the defendant bank was hopelessly insolvent. The bulk of its assets were frozen and its liabilities were greatly in excess of its assets, and it was unable to meet its obligations as they matured, so that at that time its capital stock was absolutely worthless. In the spring of 1931 its position became even more precarious, its reserves became dangerously low, and its prospects of liquidating its present assets became more and more remote. The defendant bank was absolutely unable to meet its current obligations, and even if it had been able to liquidate some of its frozen assets, it would, nevertheless, have been quite as hopelessly insolvent because of the excess of liabilities over assets. This precarious financial condition was well known to the officers and directors of the defendant bank, and they knew that unless they could procure immediate relief to enable them to take care of current obligations the bank must close. That at that time while the bank was in such a precarious condition the Comptroller of the Currency informed the bank that its bond account had been impaired to the extent of $300,000 and had fallen below the specified reserve and that the bank would have to raise the sum of $300,000 to make good such impairment or he would order the bank closed.

In these circumstances the then president of the defendant bank, Terrell M. Ragan, as a result of the demand of the comptroller that the bank raise $300,000, acting under the authority of the board of directors, set out to obtain said sum, and knowing the plaintiff to be a man of means and important in financial circles in said Boston, approached the plaintiff and requested him to put $300,000 into the defendant bank. That said Ragan, while negotiating with the plaintiff for the investment of said sum, as president of said bank being thereunto duly authorized, and acting in behalf of said bank, represented to the plaintiff that the bank was perfectly solvent, that its loans were sound, that the assets were fairly liquid, that its business was good, and that its prospects as an independent financial institution were excellent; that its only embarrassment was in the depreciation of the value of its bonds. He further represented that the national bank examiner had requested that the depreciation in the value of the bonds held and owned by the bank be made up and that a $300,000 guarantee fund be established as against said depreciation, and that if such a guarantee fund were established, the requirement of the national bank examiner would be fulfilled and the bank would be permitted to carry on its business unmolested; that the bank's assets were in excess of its liabilities and were ample to take care of all obligations as they should mature; that there was a substantial equity behind the capital stock of said bank and that said stock was an excellent investment.

All the representations made by said Ragan as set forth in the foregoing paragraph with reference to the financial condition of the defendant bank and its capital stock were false, fraudulent and intended to deceive the plaintiff and induce him to rely thereon, to advance money to said bank, to purchase a considerable quantity of the shares of its capital stock, and to refrain from selling shares of its stock which he then held, so that the price at which the stock of said bank was then selling in the market might be kept at an artificially high level in excess of its true value, and so that the knowledge of such investment, purchase and holding might be disseminated in the financial community for the same purpose. That said Ragan as president of said bank knew that the aforesaid representations were false, fraudulent and calculated to deceive and intended that the plaintiff rely upon said representations, and to act in reliance thereon; that said Ragan as president of the defendant bank knew of the bank's

hopeless insolvency, and knew that the depreciation of its bonds was but one of the many insuperable difficulties which the bank faced and that the bolstering up of the bond values by the said guaranty fund would not cure the insolvent condition of the bank, but said Ragan, nevertheless, deliberately and wilfully made the false representations expecting and intending that the plaintiff be defrauded of the moneys which he might be willing to advance in reliance upon said representations, and which he might be willing to invest in the purchase of shares of the capital stock of the defendant bank, and which he might lose by refraining from selling the shares of said bank stock which he held.

That thereafter during the year 1931 said Ragan as president of said bank continued to misrepresent to the plaintiff the financial condition of said bank and continued to represent that the bank was in a sound financial condition, that its loans were good and that its assets were fairly liquid; that there was a substantial equity behind the capital stock of said bank and that said stock was an excellent investment, and advised the plaintiff to purchase shares of its capital stock, and to refrain from selling shares of its capital stock. That said representations with reference to the solvency of said bank and its loans were false and fraudulent and were known by the defendant bank and said Ragan to be false and fraudulent, and were made for the purpose of continuing to deceive the plaintiff, and for the purpose of keeping the plaintiff in ignorance of the true condition of the bank and to induce him to purchase more shares of its capital stock and to retain such shares as he purchased in reliance upon said representations, and to refrain from selling such shares as he had purchased prior to the making of said representations, and in order that the market price of said stock might be maintained.

That the plaintiff believed the false representations made to him and continued to be made to him by the defendant bank, acting through said Ragan as hereinabove set forth, and the plaintiff, acting in reliance on said representations, and continuing to rely thereon, did purchase a considerable quantity of the stock of said bank, to wit, at various times from March 3, 1931, to November 16, 1931, 2,723 shares, and paid therefor the sum of $91,350.69, and the plaintiff did refrain from selling the shares of stock of said bank which he had purchased prior to the making of the misrepresentations hereinbefore alleged. That since the closing of the defendant bank the receiver therefor brought suit against the plaintiff upon an assessment made on account of said stock and that the liability of the plaintiff on account of said assessment has been satisfied by a compromise approved by the court.

The defenses set up in the answers were general denial, res adjudicata, and negligence on the part of the plaintiff.

At the close of all the evidence defendant filed a motion for a directed verdict on the following grounds:

1. Failure of the plaintiff to state and prove a claim upon which relief can be granted.

2. Want of sufficient evidence to show responsibility of defendant bank for the alleged deceit.

3. The evidence shows that the claims here in litigation have been duly compromised and released.

4. The evidence adequately shows that the plaintiff's cause of action had been adjudicated by this court before the present suit was begun.

5. The evidence fails to show any amount of damages which can be recovered against the defendants.

6. The evidence shows that pursuant to the statutory provisions appearing in 12 U.S.C. § 82 [12 U.S.C.A. § 82] the defendant bank is precluded from all liability to the plaintiff.

The court granted the motion for directed verdict on the ground that the plaintiff had not introduced sufficient evidence to establish the authority of the president to make these misrepresentations.

In granting the motion for a directed verdict, the trial court stated that it did so on the ground that there had not been sufficient evidence introduced of the responsibility of the bank for Ragan's statements and conduct.

In Clark v. Boston-Continental National Bank, 1 Cir., 84 F.2d 605, at page 606, the court said:

"Two questions are raised in this case:

" (1) Whether a corporation may be held for the false representations made by its directors, or under their authority * * *."

And it then held that:

"If the false representations made by the president of the bank, under the authority of its directors, can be said to have been made in the course of its business and for its benefit, then it has been held that the false representations are those of the corporation whether they are in excess of its corporate powers or not."

 Did the plaintiff show by the evidence that the president of the defendant bank acted under the authority of the bank in deceiving the plaintiff? The burden of proof was on the plaintiff to do so. In this he failed. The president of the bank made statements of various kinds to the plaintiff, all of which were intended to be to his own personal advantage and to the personal advantage of certain other directors of the bank. The purchase of such stock by the plaintiff would not necessarily result in advantage to the defendant bank. Nowhere in the record does it appear that the board of directors ever voted authority to the president, or ratified his actions in any way, to make the defendant responsible. As president of the defendant bank Ragan was expressly or impliedly authorized to do certain things which readily fell within the realm of his sphere of activity as president. But that does not make the bank liable. Outside of the ordinary business of the bank, he has no right to act without special authority. Bingham v. National Bank, 105 Mont. 159, 72 P.2d 90–99, 113 A.L.R. 315; American Surety Co. v. Pauly, 170 U.S. 133, 155, 156, 18 S.Ct. 552, 42 L.Ed. 977. What the president did in this case was outside of the ordinary business of the bank.

The directors authorized the president to raise the money but did not authorize him to make false representations in so doing. As president it was beyond the scope of his duties to misrepresent the condition of the bank.

The board of directors at no time authorized him so to act. The minute book of the directors nowhere shows any authority running to the president from the board of directors to promote dealings in bank shares. Clearly, such actions are not within the limits of any duty imposed upon the president of a bank. Further, they operated to the detriment of the bank in this case since the bank was under obligations to obtain a certain number of shares of the bank stock under the terms of its agreement with the plaintiff, which was the subject of another suit.

 The plaintiff was an experienced business man. As such he should not have acted without clear and positive evidence of the action of the board of directors in such a matter. It is not the business of nor any part of the duty of the president of a bank to give advice as to the value of the stock of the bank to prospective purchasers. Farmers' State Guaranty Bank v. Cromwell, 70 Okl. 199, 173 P. 826. It does not appear from the entire record that the substantial rights of the parties were affected in any way by the action of the trial judge. No evidence was presented by the plaintiff to show that the president of the defendant bank was authorized in any way to make the alleged fraudulent representations upon which the plaintiff acted allegedly to his loss.

The determination of this question is decisive of the case. There is no necessity for this court to pass on any further points involved.

The defendant's motion for a directed verdict was properly granted.

The judgment of the District Court is affirmed with costs.