NATIONAL BANK OF MONTANA, RESPONDENT, *v.* BINGHAM, APPELLANT.

(No. 6,837.)

(Submitted November 3, 1931.    Decided November 24, 1931.)

[5 Pac. (2d) 554.]

*Mr. F. W. Mettler,* for Appellant, submitted a brief and argued the cause orally.

*Mr. T. B. Weir* and *Mr. Harry P. Bennett,* for Respondent, submitted a brief; *Mr. Bennett* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Minnie H. Bingham has appealed from a judgment and decree of foreclosure of a real estate mortgage entered in favor of the plaintiff, the National Bank of Montana.

Over a period of years immediately preceding 1924, Frank R. Bingham and his wife, the defendant, had acquired title to 1800 acres of land in the name of Frank R., and 366.22 acres in the name of Minnie H., and had built up a fair herd of Hereford cattle, full-bloods, branded "L U," a brand owned by Mrs. Bingham, and the grades "K U," which was Bingham's brand; in so doing they had become indebted to the plaintiff bank in a sum in excess of $30,000.

On April 11, 1924, the bank required the Binghams to execute and deliver to it their joint note for $22,500, secured by their joint mortgage on all of their real estate, and a chattel mortgage on all of their cattle.

On July 20, 1925, Frank R. Bingham gave to the bank his individual note for $11,700, secured in part by a chattel mortgage on machinery and certain calves. At this time, and for some time thereafter, the relations existing between the officers of the bank and the Binghams were very friendly and the latter were considered "A-1 Moral Risk"; all indebtedness was treated as "the Bingham indebtedness" and all security as "Bingham security"; a checking account was carried in the name of the husband, but Mrs. Bingham's checks were honored against it.

Mr. Fred Heinecke, cashier of the bank, kept the Binghams' books and looked after their affairs; he had frequent conferences with them which "lasted for hours"; as the checking account became depleted, he accepted the husband's unsecured notes in amount ranging from $100 to $550 for "running expenses."

During the years 1924 and 1925 the calf crops were sold and many of the cattle shipped to market, the checks therefor being delivered to the bank and credited to the Bingham account. Owing to the fact that the bank was financing the enterprise, a portion of these receipts was consumed by overdrafts and payment of current expense notes, but when the account showed a substantial balance Mr. Heinecke drew the amount out, by means of a "memorandum check" over his initials, for application on the indebtedness.

The 1924 receipts totaled $6,398.31, and $5,580 thereof was duly credited on the joint note, but, while the receipts for 1925 amounted to $5,791.70, no part thereof was so credited; instead, $3,700 was credited on Frank R. Bingham's individual note for $11,700.

In 1926, the Binghams being in default, the bank foreclosed on the cattle and, as a result of their sale, credited $9,650 on the joint note; it then instituted foreclosure proceedings on the real estate mortgage. Mrs. Bingham filed a separate answer in the foreclosure proceedings, alleging that, by reason of misapplication of funds, she should be exonerated and awarded a substantial judgment. Bingham defaulted and

filed a petition in bankruptcy in which he listed his lands as his chief asset, placing a value of $20,000 on them; he listed the Bingham indebtedness as his principal liability.

The bank filed its claim in the bankruptcy proceeding for the total balance due on the "Bingham indebtedness," $23,-503.43, of which $10,566.25 was apportioned to the joint note.

Assuming from the record that the Frank Bingham lands had a substantial value in excess of the mortgage debt, the trustee in bankruptcy secured an order to sell these lands free and clear of the mortgage, but, on the sale, the bank bid the lands in for $8,250; the sale was confirmed and, after deducting the costs of sale, taxes paid, trustee's commission, and attorney's fees, the balance was credited on the joint note, which then showed a balance due of $2,892.67.

The bank thereafter filed an amended complaint in the foreclosure proceeding, eliminating Bingham as a party and seeking judgment against this defendant alone for the above balance, and decree of foreclosure as to her land. Mrs. Bingham answered, claiming a full discharge of her obligation and a balance due her from the bank of $4,929.14. The facts more fully appear in *National Bank of Montana* v. *Bingham*, 83 Mont. 21, 269 Pac. 162.

On a hearing the trial court found all issues in favor of this plaintiff, entering judgment against this defendant for $3,631.96, and decreed the foreclosure and sale of her lands, directing that the purchaser be let into possession on production of the sheriff's certificate of sale.

On appeal, defendant predicates error upon the action of the court in holding that the bankruptcy sale is "conclusively binding" on her and in not crediting on the joint note the difference between the sale price and the assumed value of $20,000 placed on the Frank Bingham land. Error is then predicated on not crediting on the mortgage note the full receipts from cattle sold and on the court's order denying defendant possession of her land during the period of redemption.

1. While defendant produced some testimony to the effect that Frank Bingham's land was worth considerably more than

the amount received on the trustee's sale, the testimony was immaterial on this proceeding.

It is true that the state court had acquired jurisdiction over ▮ the subject matter of the foreclosure proceeding before the bankruptcy proceeding was instituted, but there is nothing in the rule of comity to prevent the parties from taking the action they did. The voluntary surrender, by the bankrupt, of his property to the bankruptcy court or its officers, was equivalent to consenting to the jurisdiction of that court over the subject matter (1 Collier on Bankruptcy, 759; *T. E. Wells & Co.* v. *Sharp,* 208 Fed. 393, 125 C. C. A. 609; *In re Brantman,* 244 Fed. 101, 156 C. C. A. 529), and when the bank filed its claim in the bankruptcy proceeding it consented to the jurisdiction of that court, both as to the property and its claim (1 Collier on Bankruptcy, 761; *In re Howard Laundry Co.,* 203 Fed. 445, 121 C. C. A. 555).

In so far as the rights and obligations of Frank Bingham ▮ are concerned, they were removed to the bankruptcy court and we cannot interfere with the judgment of that court. As Mrs. Bingham was not a party to that proceeding, any rights she may have had in the property of her husband are not affected by that proceeding, but that fact does not aid her here.

Even if the above rules did not foreclose inquiry, the evidence does not so strongly preponderate against an implied finding that the price received was adequate, as to warrant us in overturning it.

2. As to the receipts from the sale of mortgaged cattle, it is ▮ clear that, in 1924, $818.31 of the receipts was used by the Binghams, with the consent of the bank, for necessary running expenses of their joint enterprise, and it is reasonably clear that, in 1925, $2,091.70 was consumed in like manner. In effect, the bank waived its right to the application of these amounts on the mortgage debt in order that the Binghams might continue to operate for the benefit of all concerned. All of the property owned by the joint operators being mortgaged, they could not have continued the business without

some such arrangement; their affairs were frequently discussed at length, and it would seem clear that it was within the contemplation of both parties to the mortgage that the proceeds from the sale of cattle should be first applied to such necessary running expenses.

Similar situations have been before other courts which have found no difficulty in determining that the application of proceeds of sale of mortgaged chattels to the necessary expenses of the business in which the mortgaged property is used may be made in spite of the general rules of law governing the application of such funds, though the courts do not always approach the question from the same viewpoint.

In *Cain* v. *Vogt,* 138 Iowa, 631, 128 Am. St. Rep. 216, 116 N. W. 786, 788, the court arrived at its conclusion by applying the general rules applicable, and holding that, on a sale by the mortgagor, the lien of the mortgage did not follow and attach to the money received, and, consequently, when the money was paid over to the mortgagee by the mortgagor, the former was at liberty to apply it as he saw fit, but said: "It should be said before leaving this branch of the case that the rules of law to which we have referred, while generally recognized and approved, are not without their exceptions, and that a court of equity will always feel at liberty to so control their application as to prevent manifest injustice to either party."

In *Thorne* v. *Allen,* 72 Minn. 461, 75 N. W. 706, the court, without attempting to distort the general rules applicable to application of funds under the circumstances, in effect held that it would be inequitable, after advances had been made, to permit the mortgagor to continue his business, to deprive the mortgagee of the amount advanced by the application of rules which would compel the crediting of the total amount of proceeds from the mortgaged property on the mortgage debt, and therefore denied such application.

The principle that where advances are made to enable the mortgagor to carry on a business with mortgaged property, the property or proceeds from the sale thereof are liable for the

payment of the advances, is also recognized in *Lyon* v. *Bass,* 76 Ark. 534, 89 S. W. 849.

The general rules governing the application of funds derived from the sale of mortgaged property do not apply to the situation here considered, as it would be inequitable to so apply them where, as here, the mortgagee has made advances for the purpose of protecting the mortgaged property under what would be at least an implied agreement that the advances would be repaid when the property was sold.

The court did not err in refusing to credit on the joint note the amounts deducted from receipts in order to repay advances made; but what of the $3,700, known to plaintiff to have been realized from the sale of mortgaged cattle, security for the payment of the joint note, and applied by the plaintiff on Frank R. Bingham's individual note, not given for advances, but manifestly for a past indebtedness?

It is elemental that, when a single debtor owes more than one debt and, on making a general payment to his creditor, fails to direct as to which debt should receive the credit, the creditor is at liberty to apply the payment on any one of the debts he sees fit. This general rule finds expression in our section 7430, Revised Codes of 1921. Under this rule, a general undirected payment may be applied to an unsecured debt, though the debtor owes also a secured debt (21 R. C. L., 96), and a surety on the secured debt is in no position to complain of such action (*Sturtevant* v. *Fidelity & Deposit Co.,* 92 Wash. 52, L. R. A. 1917C, 630, 158 Pac. 740).

A wife, signing a mortgage with her husband, is but a surety for his debt, and this rule is held to apply even where the wife mortgaged her separate property to secure a note given by herself to procure advances to the husband, when the advances exceeded the amount of the mortgage note, and application of general payments was made on the unsecured portion of the account. In foreclosure proceedings the court said: "There being no special instructions on the subject, the plaintiffs had the right to apply these credits so as 'to leave the balance at the foot of the account, to constitute the mortgage

debt.' (*Williams* v. *Vance,* 9 S. C. 349 [30 Am. Rep. 26].)"
(*Greig* v. *Smith,* 29 S. C. 426, 7 S. E. 610, 612.)

However, the payment now under consideration, while "undirected," was not a "general payment," but a payment from the proceeds of the sale of mortgaged property, a part of the security for the payment of the joint note secured by the mortgage. Contending that this fact does not alter the rule, plaintiff relies upon a statement found in 21 R. C. L. at page 97, where, after stating the limitation of the rule, as hereinafter discussed, but which the author seems to restrict to "money derived from a foreclosure sale of property given to secure the payment of a particular debt," the writer declares: "But the rules which bind the mortgagee who sells on foreclosure, or takes possession of and sells and converts the security, have little application to a case where the payment is made from money obtained by a voluntary sale by the mortgagor. In the latter case the lien of the mortgage does not follow and attach to the money, and the mortgagee has no recourse on any other person to whom such moneys may be paid. In the hands of the mortgagor they have no character different from money derived from a wholly different source; and when paid over to the mortgagee in the absence of an agreement or direction as to their application, the latter has the right to credit them on the unsecured debt without regard to the source from which they were obtained by the debtor." This statement is taken from *Cain* v. *Vogt,* above, and that is the only case cited in support of the text. It will be noted that nothing is said in the statement with reference to knowledge on the part of the creditor as to the source of the funds paid in; it may be a correct statement of the rules applicable when the creditor is not advised, and has no knowledge of the source of the fund, but if it is intended to apply regardless of knowledge, it is not only in direct conflict with the opening statement of the section in which it is found (103) that "another limitation put on the power of the creditor to apply payment is that where money is derived from a particular source or fund, it must be applied to

the relief of the source or fund from which it was derived,'' but with the great weight of authority.

It is true that the only case cited in the text as supporting the last quoted rule, deals with an involuntary sale of the mortgaged property; but the rule is not, under the authorities, confined to this situation.

The above-quoted ''limitation'' applies particularly to payments made from money derived from the sale of mortgaged property and, as an exemplification of the rule, it is declared: ''If the payment is made from the proceeds of the sale of the mortgaged property, then it must be applied to the mortgage, without any special direction being necessary.'' (*Ellis* v. *Mason*, 32 S. C. 277, 10 S. E. 1069; *Town of Brighton* v. *Doyle*, 64 Vt. 616, 25 Atl. 694; *Boyd* v. *Jones*, 96 Ala. 305, 38 Am. St. Rep. 100, 11 South. 405; *Snider* v. *Stone*, 78 Ill. App. 17; *Cummings* v. *Erickson*, 116 Wash. 347, 199 Pac. 736.)

While a mortgagor may consent to or ratify an unauthorized application of proceeds from the sale of mortgaged property (21 C. J. 97, sec. 103), the record does not justify the assertion that this defendant did so, nor does the record justify the further assertion that she slept on her rights and, therefore, should not be accorded relief.

Mr. Heinecke, acting for the bank and for the Binghams, handled all of the transactions with respect to the sale of cattle, and, while he had many lengthy conferences with the latter respecting their business, there is nothing in the record to indicate that payment of the $11,700 note, or its existence, was ever discussed in the presence of Mrs. Bingham. She testified to the effect that, at the time she was induced to sign the joint note and mortgage, she was assured that, if the note for $22,500 was given, the balance of the then outstanding indebtedness would be charged off, and the uncontradicted evidence is that when she discovered the large amount still due on the mortgage note, she inquired of Mr. Heinecke why the note remained so large after all the cattle sold had been accounted for, to which he merely replied that she ''didn't un-

derstand the banking business.'' She cannot be said to have been shown to have had such knowledge of her rights that such delay as is shown would constitute laches.

Further, from the history of the litigation, it would seem that this defendant has been asserting her rights at all times when an opportunity offered.

On the record, the plaintiff was without authority to apply the $3,700 payment on the Frank R. Bingham's individual note, and the court erred in not holding that this amount constituted a payment on the mortgage note. Had the credit been made, it would have appeared that the bank received such proceeds from the sale of mortgaged cattle, and the subsequent foreclosure of the chattel mortgage and sale of the Frank R. Bingham land by the bankruptcy court would have entirely extinguished the mortgage note and entitled this defendant to the satisfaction of the mortgage on her land, with a small balance over.

Defendant is not entitled to judgment against the plaintiff on her cross-complaint, however; the balance would have been the result of the last transaction looking toward the extinguishment of the joint indebtedness, which was the sale of Frank R. Bingham's land; the balance would then have gone toward the satisfaction of other debts listed in the bankruptcy proceeding, among which was a claim of this plaintiff for more than $12,000, and on which it was paid dividends amounting to only $135.

The judgment is reversed and the cause remanded to the district court of Meagher county, with direction to enter judgment that plaintiff take nothing by this action, and decree that the mortgage sought to be foreclosed is fully satisfied and discharged and the lands therein described are free and clear of the lien of the mortgage.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES GALEN, FORD and ANGSTMAN concur.

Rehearing denied December 11, 1931.