BINGHAM, Respondent, *v.* NATIONAL BANK OF MONTANA, Appellant.

(No. 7,620.)

(Submitted May 10, 1937. Reargued June 22, 1937. Decided July 6, 1937.)

[72 Pac. (2d) 90.]

*Mr. C. A. Spaulding,* and *Messrs. Weir, Clift & Bennett,* for Appellant, submitted briefs; *Mr. Spaulding* and *Mr. T. B. Weir* argued the cause orally, both at the original hearing and on reargument.

*Mr. Lester H. Loble, Mr. Hugh R. Adair* and *Mr. Frank W. Mettler,* for Respondent, submitted briefs; *Mr. Adair* argued the cause of the original hearing, and he and *Mr. Loble* argued it on reargument.

## Opinion: PER CURIAM.

Plaintiff brought this action to recover damages for interfering with her possession of certain real property situated in Meagher county. The action was brought against the defendant bank, Thomas A. Marlow, Richard Manger, Clara Manger, his wife, Russell Manger, and Manger Ranches, a copartnership. At the close of all the evidence a motion for directed verdict in behalf of Russell Manger and Thomas A. Marlow was granted. The cause was submitted to the jury as to the other defendants. The jury found in favor of all the other defendants save the bank. It found for plaintiff as against the bank, and fixed her damages in the sum of $15,000. Judgment was entered on the verdict. The bank's motion for new trial was denied, and it appealed from the judgment.

The important facts giving rise to the controversy may be briefly summarized as follows: Plaintiff and Frank R. Bingham intermarried in 1908. After their marriage plaintiff's father, Alexander Watson, advanced them the sum of $1,500 with which to purchase a homestead relinquishment covering the property here involved. On this homestead plaintiff and her husband lived and operated a stock ranch. They gave Alexander Watson their note in the sum of $1,500. The interest on the note has been paid, and plaintiff paid out of her own funds $1,000 on the note and the remaining $500 was never paid.

Patent to the land ran from the United States to Frank R. Bingham. He also held certain land contracts of the Northern Pacific Railway Company. In 1924 Frank R. Bingham owed the defendant bank $31,000 which was unsecured. At the request of Thomas A. Marlow, president of defendant bank, Bingham and his wife (the plaintiff) executed and delivered to the bank a real estate mortgage covering the homestead. They also executed assignments of the Northern Pacific land contracts and a chattel mortgage on cattle belonging to each of them. Mr. Marlow was advised at the time of taking the security that plaintiff owned a half interest in the Bingham homestead, as well as a half interest in the Northern Pacific land contracts, and that each had separate cattle and separate brands.

On August 5, 1926, the bank commenced an action in Meagher county to foreclose the real estate mortgage covering the homestead. On September 7 thereafter Frank R. Bingham filed a voluntary petition in bankruptcy, and on September 20, 1926, was adjudged a bankrupt, and Addison K. Lusk was appointed trustee in bankruptcy. Plaintiff was not directly a party to these proceedings.

The bank, on December 10, 1926, filed its written consent that the bankruptcy court assume and exercise jurisdiction over and sell the property embraced in its mortgage. The trustee in bankruptcy offered the land for sale free and clear of liens. The bank became the purchaser at the sale. On February 2, 1927, the trustee in bankruptcy executed to the bank a trustee's deed. On March 24 of that year the bank deeded the property

to Richard and Clara Manger, the deed being recorded May 20, 1927. On May 26, 1927, Richard and Clara Manger filed a petition in the United States district court for a writ of assistance to enable them to obtain possession. On that day a writ of assistance was issued by the clerk directing the marshal to enter the land and to "eject and remove therefrom all and every person or persons holding or attempting to hold the same, or any part thereof, against the said Richard Manger and Clara Manger, and that you deliver to the said Richard Manger and Clara Manger, or their assigns, the possession of said pieces or parcels of land without delay. And them, the said Richard Manger and Clara Manger in such possession thereof from time to time keep and defend, and cause to be kept, maintained and defended, according to the tenor and true intent of said order of sale of the said court, and the said trustee's deed aforesaid."

The deputy marshal went to the property and found plaintiff in possession. Plaintiff, upon being advised of the deputy marshal's mission, left the property to consult her attorney. The officer placed an agent of the Mangers in possession and made return to the court that the writ was executed. This return was filed on May 31, 1927. After consulting with her attorney, plaintiff returned to the homestead and resumed possession. On July 7 thereafter plaintiff moved the court to set aside the writ of assistance; this the court denied on July 22. On August 23, two deputy marshals again visited the homestead and sought to induce plaintiff to leave the premises, but this she refused to do. On August 24 the Mangers filed a petition in the United States district court for an alias writ of assistance, which was on that day, by order of Judge Pray, issued by the clerk. This writ was subsequently, on January 12, 1928, held by the Honorable George M. Bourquin to be void *ab initio*. Armed with the alias writ, the United States Marshal and his three deputies again went to the Bingham homestead. Finding the doors of the house locked, they left the place and returned again on August 30 and established camp in the bunk house on the property, and from then until September 20 remained on the property day and night.

Plaintiff testified that she was then pregnant and gave premature birth to a child, which, she said, was living when born but died shortly thereafter. While the deputy marshals were present, plaintiff was denied the right to receive visits by relatives and friends; the telephone wire was cut and she was unable to talk with anyone by telephone. She testified that she was denied the right to send out letters or confer with her lawyer. Her hired man was arrested and handcuffed within her sight and placed in jail. Her livestock was not cared for, and she herself suffered from want of sufficient food and drink. Her brother finally gained admission after plaintiff had screamed from an upstairs window that "I have a dead baby up here." He gained admission by breaking the lock, and found plaintiff on the bed with three guns by her side. She was given medical attention, and finally, on September 20, left the premises at the solicitation of her physician. After she left, the officers removed her furniture to the sheep sheds, the husband stating to them that he did not have time to remove it.

Defendant assigns fifty specifications of error, some of which challenge the sufficiency of the complaint and of the evidence. The gist of the complaint is that, while plaintiff was in the peaceable possession and occupancy of the premises in question, the defendants, their agents, servants and employees wrongfully and unlawfully came upon the premises, and wrongfully, unlawfully, forcibly and by threats of bodily violence and other wrongful and unlawful means, method and conduct endeavored to compel plaintiff to leave, abandon and remove from the premises, resulting in her illness and damage specifically alleged in detail. The complaint was sufficient to constitute a cause of action.

Did the proof sustain the cause of action as alleged? Did the proof establish that plaintiff at the time of the alleged wrongful acts was in the rightful possession of the premises? Plaintiff answers in the affirmative and rests her contention upon the claim that she owned an interest in the property by reason of having advanced most of the money for the purchase price thereof, of which the bank had knowledge. This evidence

does not establish that she had an interest in the property. It will be remembered that the legal title to the property stood in the name of Frank R. Bingham. Section 6785, Revised Codes, provides: "When a transfer of real property is made to one person, and the consideration thereof is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made." This section, however, does not apply in a case such as this, under facts such as we have here. Where the relationship between the person advancing the money and the person taking the legal title is that of husband and wife, the presumption, rebuttable in character, is that the conveyance is made as a gift. (*Clary* v. *Fleming*, 60 Mont. 246, 198 Pac. 546; *Humbird* v. *Arnet*, 99 Mont. 499, 44 Pac. (2d) 756; *McQuay* v. *McQuay*, 81 Mont. 311, 263 Pac. 683.) The presumption also is that any advancement by a wife to her husband is a gift. (*Bast* v. *Bast*, 68 Mont. 69, 217 Pac. 345; *Roman* v. *Albert*, 81 Mont. 393, 264 Pac. 115.)

It is here urged that section 6785 is all-inclusive, applying to every transaction without regard to existing relationships between the parties, but this court has consistently recognized, in instances of close relationship, that the presumption of a trust, as declared by section 6785, is supplanted by the presumption of a gift. The last decision applying this latter presumption was *McLaughlin* v. *Corcoran*, 104 Mont. 590, 69 Pac. (2d) 597. These decisions have all been by a unanimous court, although decided by an ever-changing personnel of the court. They have been rendered over a period of some sixteen years. Eight times since the first decision declaring the presumption of a gift was rendered has the legislature met in regular session; yet no successful attempt was made by the legislature to change the rule as declared by this court in this respect. Hence, a majority of this court is unwilling to change this established and well-settled rule of law.

It is further argued that a majority of the decisions of the American courts of last resort have ruled that no presumption of a gift obtains in cases where the wife pays the consideration and the husband takes title to property in his name. No one

can question the fact that a majority of the decisions of the American courts so hold. But a very respectable minority of these courts hold in accord with the previous decisions of this court. (Bogert on Trusts & Trustees, sec. 460; *White* v. *Amenta,* 110 Conn. 314, 148 Atl. 345; *Hogan* v. *Hogan,* 286 Mass. 524, 190 N. E. 715; *McCormick* v. *Cooke,* 199 Pa. St. 631, 49 Atl. 238; *Denny* v. *Schwabacher,* 54 Wash. 689, 104 Pac. 137, 132 Am. St. Rep. 1140; *Whitten* v. *Whitten,* 70 W. Va. 422, 74 S. E. 237, Ann. Cas. 1915D, 647, 39 L. R. A. (n. s.) 1026.) The majority rule in many instances was adopted prior to the passage of what is commonly referred to as "Married Woman's Acts." Most commentators agree that since the passage of Married Woman's Acts, the reason for not presuming a gift is no longer sound, as prior to their enactment the wife occupied an inferior position economically and labored under serious disabilities with regard to taking, holding and managing property. (Bogert on Trusts & Trustees, sec. 460; 11 Illinois Law Rep. 529; 24 Columbia Law Rev. 325; 37 Harvard Law Rev. 921.)

Furthermore, one of the reasons often advanced for the adoption of the majority rule was the fact that under the then existing law a wife was never bound to support her husband. Although her duty in that respect is not now absolute, in certain instances under our statutory law the wife is bound to support, or contribute to the support of, the husband or the family. (Secs. 5782, 5784, 5790 and 5799, Rev. Codes.)

Since the reason for the adoption of the majority rule does not obtain in this jurisdiction, the rule as heretofore declared by this court is more in keeping with our laws than is the majority rule, and, accordingly, we see no sufficient reason why we should now reverse the former decisions of this court and adopt a contrary view.

Before plaintiff can establish that she has an interest in the property by reason of having advanced money with which to pay for the property, she must establish that the money was not advanced as a gift and that the conveyance to the husband was not so intended. Such proof was not presented in this case. Hence, so far as the record before us is concerned, plaintiff must

be treated as a stranger to the title and without right of possession thereof.

While possession alone is sufficient to enable a plaintiff to ▇ maintain an action in trespass against a tortfeasor or naked trespasser (*Sell* v. *Graves*, 16 Mont. 342, 40 Pac. 788; *Thrasher* v. *Hodge*, 86 Mont. 218, 283 Pac. 219), it is not sufficient as against the owner. (*Noyes* v. *Black*, 4 Mont. 527, 2 Pac. 769; *Lightner Min. Co.* v. *Lane*, 161 Cal. 689, 120 Pac. 771, Ann. Cas. 1913C, 1093; *Southern Ry. Co.* v. *Hayes*, 183 Ala. 465, 62 So. 874; *Spicer* v. *Dashiells*, 5 Boyce (28 Del.), 493, 94 Atl. 901; *Lavin* v. *Dodge*, 30 R. I. 8, 73 Atl. 376; *Lyles* v. *Fellers*, 138 S. C. 31, 136 S. E. 15; *Chappee* v. *Lubrite Ref. Co.*, (Mo. App.) 89 ▇ S. W. (2d) 543.) Of course, if the owner uses more force than is reasonably necessary to gain possession of his own he is liable for the resulting damage. (*Southern Ry. Co.* v. *Hayes*, supra; *Singer Sewing Machine Co.* v. *Hayes*, 22 Ala. App. 250, 114 So. 420; 63 C. J. 845, notes 18 and 20.) At the instance of defendants the jury was so instructed. The question, therefore, before us is: Was there sufficient evidence of the use of excessive force to warrant submission of the case to the jury on that issue? We think there was.

As above pointed out, plaintiff's employee was handcuffed, arrested and placed in jail. The handcuffing of her employee was observed by plaintiff through the window of the house, and she had reason to suppose from this act that a like fate might befall her were she to come out of the house or allow the officers to enter it. The rule is that, "When a person enters upon the actual possession of another, and by his language or conduct gives the occupant cause to fear that he will inflict bodily harm if the person in possession does not yield, his entry is forcible in contemplation of law, whether he causes such fear by a demontration of force such as to indicate his purpose to execute his pretensions, or by actual threats to do bodily harm, or by the use of language which plainly implies a purpose to use force against any who may make resistance." (*Anthony* v. *Teachers' Protective Union*, 206 N. C. 7, 173 S. E. 6.) Also, though the evidence on the point was conflicting, there was evidence tend-

ing to show that one of the officers cut the telephone wires leading into the house so as to make it impossible for plaintiff to communicate with any of her neighbors or relatives. On the issue of excessive force the question was one for the jury.

Defendant bank next contends that, since all defendants save ▮▮ itself, were exonerated either by the court or jury, and since the bank was a corporation capable of acting only through its officers or agents, it could not be liable unless some one of its officers or agents were also liable. It contends that plaintiff sought to hold the bank through its agent Marlow, and since the court exonerated him, the bank must also be held not liable.

The court instructed the jury as follows: "You are instructed that unless you believe from a preponderance of the evidence that the acts set forth in plaintiff's complaint which she alleges resulted in injury and damage to her were done by persons who were then and there the agents, servants or employees of the defendant National Bank of Montana, then your verdict must be in favor of said defendant National Bank of Montana." It also gave the following instruction: "You are instructed that all who instigate, promote or cooperate in the commission of a trespass, or knowingly aid, abet or encourage its commission, are liable in damages to the person injured."

Had Marlow been the only agent of the defendant through whom plaintiff sought to fasten liability upon the bank, and had the jury exonerated him, there would be merit in defendant's contention. (*Lowney* v. *Butte Elec. Co.*, 61 Mont. 497, 204 Pac. 485.) But there was evidence tending to show that the officers in executing the alias writ of assistance were also agents of the bank. The bank paid the charges and expenses of the officers in executing the original writ of assistance, and the cashier of the bank testified that this payment was made upon advice of counsel in carrying out its obligation to put the Mangers in possession. Mr. Bingham also testified, without objection, that the officer in executing the alias writ told him that "the bank had sent him out." This case falls within the principle announced in *DeSandro* v. *Missoula Light & Water Co.*, 48 Mont. 226, 136 Pac. 711, and *Mullery* v. *Great Northern Ry. Co.*, 50 Mont. 408,

148 Pac. 323. Moreover, the jury did not itself pass upon the liability of Marlow; a directed verdict was entered as to him.

Plaintiff produced evidence that Marlow, president of the bank, made a statement to one of the attorneys for the Mangers, to remove plaintiff from the premises "dead or alive." Mr. Marlow denied making such statement, but the court's action in directing a verdict as to Marlow did not operate to remove this evidence from the consideration of the jury, so far as it might tend to fix liability upon the part of the bank. Plaintiff not having perfected an appeal as against Marlow, cannot, however, complain of the ruling so far as it releases him from personal liability. A case practically identical on this feature of the case is that of *Stith* v. *J. J. Newberry Co.*, 336 Mo. 467, 79 S. W. (2d) 447. In that case defendant company and one Johnson were parties defendant. The court at the conclusion of all the evidence announced that it would instruct the jury that there could be no verdict against defendant Johnson. Plaintiff's attorney thereupon announced that it would take an involuntary nonsuit as to Johnson. The case was submitted to the jury as to the corporation, and verdict was returned for plaintiff and against it. The same contention was there made as here. There plaintiff attempted to appeal from the court's ruling as to Johnson, but this appeal the court held was a nullity, so that the case is practically the same as this case. The court in disposing of it said: "In this case, however, the jury was not guilty of returning any such inconsistent or contradictory verdict. It was not called on or permitted to pass on the question of the servant Johnson's negligence in causing plaintiff's injury in falling on the icy sidewalk. That question was withdrawn from it, and the only question submitted to the jury was the negligence of the Newberry Company, and we are now holding that it properly and on sufficient evidence decided that question against that company. There was no error, inconsistency or contradiction in the jury's verdict. Had the jury been allowed to do so under the proper instructions of the court as to the law, it likely would have found Johnson guilty of negligence, and we are now holding that there was sufficient evidence to take

that question to the jury—a matter that we can inquire into on this phase of the case, regardless of plaintiff's appeal. The error in this case is not in any inconsistent and contradictory finding by the jury as to Johnson not being negligent and the Newberry Company being negligent, but in the fact that the court, under an erroneous view of the law, perhaps, or a misinterpretation of the evidence, sustained the demurrer to the evidence as to Johnson and refused to submit that question to the jury. The error was that the court erroneously discharged Johnson from liability as a matter of law. The truth is that, when the court sustained the demurrer to the evidence as to Johnson, the servant, it should have sustained the demurrer as to the Newberry Company as master, if its liability was wholly dependent on Johnson's negligence, but that was an error of the court and not any inconsistency or contradiction in the jury's verdict. It has been held that a failure of the jury, through inadvertence or mistake of fact or law, or otherwise, to return any verdict as to the servant, but only one against the master, does not present the question of an inconsistent, contradictory, and self-destructive verdict. (*Whitsell* v. *Joplin & P. Ry. Co.,* 115 Kan. 53, 222 Pac. 133; *Benson* v. *Southern Pac. Co.,* 177 Cal. 777, 171 Pac. 948; *Melzner* v. *Raven Copper Co.,* 47 Mont. 351, 132 Pac. 552.)

"The application of the rule of logic that a verdict for the servant is in effect a verdict for the master in a case where the liability of the master is wholly dependent on the negligence of the servant, and is contradictory of a finding against the master, presupposes that there has been a correct trial of the question of the servant's negligence on the merits and that such verdict is not attributable to, or brought about by, erroneous instructions to the jury as to the law. In fact, in such a case the jury is only to try the question of the servant's negligence and from that alone determine the master's liability in accordance with its finding, but if, because of an erroneous instruction, the jury does not express in its verdict its real belief as to the servant's negligence or comes to a wrong conclusion as to the servant's liability therefor, but reaches a correct conclusion as to the

master's liability, then the logic is the other way and the verdict is correct. In other words, the rule as to contradictory and inconsistent verdicts being self-destructive does not apply when such is brought about by errors of law.''

Since the evidence relating to the alleged statement of Marlow as to removing plaintiff ''dead or alive'' was not withdrawn from the jury's consideration, so far as the liability of the bank is concerned, the jury's verdict is not contradictory or inconsistent.

The next contention is that the acts complained of were done under legal process and, hence, there is no liability on the part of the officers executing the writ. We need not pass upon the question whether the officers may be held personally liable under facts such as we have here. They were not made parties defendant and the question of their liability is not before us. We may say, however, that ordinarily, if the process is regular on its face and merely voidable, and not void, the officer is protected. (*Bryan* v. *Ker,* 222 U. S. 107, 32 Sup. Ct. 26, 56 L. Ed. 114.) Here, however, the writ has been held void *ab initio.* In such case it affords no protection to the party seeking possession. (*Sweeney* v. *Montana Central Ry. Co.,* 25 Mont. 543, 65 Pac. 912.) This is the rule in other jurisdictions also. (*Bradford* v. *Boozer,* 139 Ala. 502, 36 So. 716; *Mecartney* v. *Smith,* 10 Kan. App. 580, 62 Pac. 540; *Haines* v. *Fearnley,* 56 Colo. 243, 138 Pac. 541; *Barrett* v. *Barrett,* 46 Wyo. 84, 23 Pac. (2d) 857; *Eten* v. *Luyster,* 60 N. Y. 252; *Wagner* v. *Hatcher,* 137 Ky. 406, 125 S. W. 1063.) Those who procure the officers to act are liable. (*Western Bond & Mortgage Co.* v. *Chester,* 145 Wash. 81, 259 Pac. 13; 26 R. C. L. 1120, 964; *Frick-Reid Supply Co.* v. *Hunter,* 47 Okl. 151, 148 Pac. 83; *Stump* v. *Porter,* 31 Okl. 157, 120 Pac. 639; *Inos* v. *Winspear,* 18 Cal. 397.) There was no appeal or other review of the finding of Judge Bourquin that the alias writ was void *ab initio,* and we must therefore treat this issue as settled, since the bank was a party to those proceedings. It follows that, if the officers could not

have been held personally liable, that fact would not necessarily affect the liability of the bank.

Defendant contends that its motion to require plaintiff to elect whether she would proceed in trespass or for forcible entry should have been sustained. This matter was addressed to the discretion of the trial court, and this court will not, under the circumstances here, hold that the court abused its discretion (*Sharp* v. *Sharp*, 66 Mont. 438, 213 Pac. 799), particularly where, as here the two theories are not incompatible. (*Lowry* v. *Carrier*, 55 Mont. 392, 177 Pac. 756.)

Defendant predicates error on the part of the court in permitting evidence to be introduced by plaintiff, over its objection, showing that the bank foreclosed a mortgage on plaintiff's cattle prior to the acts involved here. Since a new trial must be granted upon other grounds, we need not inquire whether the admission of this evidence was prejudicial error, but only determine whether its admission was error. Plaintiff contends the testimony was within the issues raised by the answer of the bank and the reply. This answer affirmatively alleged that the husband of plaintiff held the record title to the lands occupied by her for many years, which plaintiff and her husband mortgaged to the bank to secure a note which was also otherwise secured, all of which was admitted by the reply; and it was further alleged in this answer that certain payments were made on this note at various times. By reply plaintiff denied these payments generally, without any affirmative pleading in avoidance of these allegations. Just how proof of the foreclosure of the chattel mortgages by the bank could in any manner overcome the proof of these payments is not apparent to us, nor is it demonstrated by counsel for plaintiff. Clearly, the evidence of these foreclosures was irrelevant to any issue in the case and, therefore, was inadmissible; hence error was committed.

Defendant contends that it was error to permit Dr. Cooney, who treated plaintiff, to recount the history of her case as given to him by her, and to state that her confinement in the Bingham house would aggravate her nervousness. This evidence was admissible and properly received. (*Chicago, R. I. &*

*P. Ry. Co.* v. *Jackson,* 63 Okl. 32, 162 Pac. 823; *Weygandt* v. *Bartle,* 88 Or. 310, 171 Pac. 587; *Yarbrough* v. *Carlson,* 102 Or. 422, 202 Pac. 739; *Buell* v. *Park Auto Transp. Co.,* 132 Wash. 92, 231 Pac. 161; *Willoughby* v. *Zylstra,* 5 Cal. App. (2d) 297, 42 Pac. (2d) 685; *Texas & N. O. R. Co.* v. *Churchill,* (Tex. Civ. App.) 74 S. W. (2d) 1030; *Curfman* v. *Monongahela Pub. Serv. Co.,* 113 W. Va. 85, 166 S. E. 848.)

Defendant contends that the trial court erred in permitting plaintiff to prove, over its objection, that plaintiff and her husband owned the land in question jointly, and that plaintiff from her own funds paid $1,000 of the $1,500 hereinabove mentioned. The court in admitting this evidence announced that it was not admitted to show any legal right in plaintiff, but only to show that she was acting in good faith ''and claimed it.'' This evidence was not admissible to show good faith on the part of plaintiff. Her good faith was not an issue in the case. It was admissible as a link in the chain of proof showing an equitable interest. If on another trial this testimony is again offered, unaccompanied by other competent evidence sufficient at least prima facie to overcome the presumption of a gift, all of this evidence introduced in an attempt to establish some equitable interest in these lands in favor of the plaintiff should on motion be stricken, and the jury instructed in accordance with the views herein expressed.

Defendant complains of the fact that it was not permitted on cross-examination of one of plaintiff's witnesses to have an answer to the following question: ''You really have a personal interest in this suit, haven't you?'' The witness had already stated that ''I would like to see them [meaning the Binghams] win this lawsuit. I am a pretty good friend of theirs.'' The defendant already had the benefit of testimony from the witness showing his desire that plaintiff win the lawsuit, and the exclusion of further testimony on the point could not have been harmful to it.

It is further contended by defendant that the court erred in admitting, over its objection, the declaration above referred to and claimed to have been made by Mr. Marlow to Mr.

Angell, wherein the former stated to the latter over the telephone in connection with the removal of plaintiff from the premises in question, "Take her out dead or alive." The witness had stated that she was familiar with the voice of Marlow and of Angell, and that she heard Angell ask over the telephone if "this is Marlow," and receiving an affirmative answer the statement above quoted was then made by Mr. Marlow after Angell had stated that he was encountering difficulty in removing plaintiff. So far as the identification of Marlow and Angell was concerned, it was sufficient foundation for the admission of the statement. (*Greenberg* v. *Greenberg*, 79 Ind. App. 218, 133 N. E. 18, 134 N. E. 311; *Rich* v. *Weeks*, 279 Mass. 452, 181 N. E. 712; *Wyckoff* v. *Jarrell*, 5 W. W. Harr. (Del.) 542, 170 Atl. 802.) The more serious question, however, is whether this evidence was admissible against the bank.

The defendant bank is a national bank. The record discloses that Marlow was the president of the bank, but is silent as to what his powers and duties were as provided by the by-laws; also as to the powers usually and customarily exercised by him in acting on behalf of the bank. Since it does not appear that this statement was communicated to others, no question of the effect of anyone relying thereon and acting on such reliance is submitted. No question of apparent or ostensible authority is involved. In view of the fact that Marlow is eliminated from the case, the only purpose for which this testimony was admitted as against the bank was to establish malice, and hence, unless Marlow was speaking authoritatively for the bank, no malice would thereby be proven on the part of the bank, and therefore the testimony was inadmissible. Thus the question is fairly presented: Was Marlow, by virtue of his office, authorized to make this statement on behalf of the bank?

The affairs of national banks are managed by not less than five directors. (Sec. 71, Title XII, U. S. C. A.) The president of a national bank is a member of the board of directors. (Sec. 76, Id.) He is appointed by the board of directors who have the power to define the duties of the president. (Sec. 24, subd.

5, Id.) By law it is his duty to certify payments made on the stock of the corporation (sec. 53, Id.) ; to cause to be kept in the office of the bank a list of stockholders (sec. 62, Id.) ; to verify under oath reports of the bank made to the Comptroller of the Treasury (sec. 161, Id.), and the reports of dividends paid (sec. 163, Id.). There are many acts which the president of a national bank is impliedly authorized to do where they are fairly within the ordinary routine of his business as president. (7 Michie on Banks & Banking, sec. 129; *American Surety Co.* v. *Pauly,* 170 U. S. 153, 18 Sup. Ct. 552, 42 L. Ed. 977.) But he is the executive agent of the directors to perform such duties as may be devolved upon him, and is not the corporation and cannot take the place of the governing board or incur liabilities outside the ordinary business of the bank without special authority. (*Z*ollman on Banks and Banking, sec. 611; *First National Bank of Lyons* v. *Ocean Nat. Bank,* 60 N. Y. 278, 288, 19 Am. Rep. 181.) It has been held that the making of a statement as to the honesty and fidelity of an employee, for the benefit of the employee to enable him to obtain a bond insuring his fidelity, was no part of the ordinary routine business of a bank president. (*American Surety Co.* v. *Pauly,* supra.) It has been said there can be no doubt that the president of a national bank has no authority by virtue of his office to draw checks against the account kept with another bank of which he is the president. (*Putnam* v. *United States,* 162 U. S. 687, 16 Sup. Ct. 923, 40 L. Ed. 1118.)

We have said with reference to the powers of the president of a corporation generally, in *Mayger* v. *St. Louis Min. & Milling Co.,* 68 Mont. 492, 219 Pac. 1102: "This court never followed the ancient rule that the president of a corporation has no greater power than any other director. On the contrary, long ago it adopted the more modern and what Mr. Fletcher (3 Fletcher's Cyclopedia Private Corporations, sec. 2011) calls 'the sensible rule, in accordance with the well-recognized ideas of the people at large, that a president of a corporation is the head of the corporation subject to the control of the board of

directors as to matters out of the ordinary, but with power to bind the corporation in regard to contracts involved in the everyday business of the corporation.' In *Trent* v. *Sherlock*, 24 Mont. 255, 61 Pac. 650, Mr. Chief Justice Brantly said: 'No principle of law is more clearly settled than that an agent to whom is intrusted by a corporation the management of its local affairs, whether such agent be designated as president, general manager, or superintendent, may bind his principal by contracts which are necessary, proper, or usual to be made in the ordinary prosecution of its business [citing cases.] The fact that he occupies, by the consent of the board of directors, the position of such an agent, implies, without further proof, the authority to do anything which the corporation itself may do, so long as the act done pertains to the ordinary business of the company. (*Mathias* v. *White Sulphur Springs Assn.*, 19 Mont. 359, 48 Pac. 624; *Ceeder* v. *H. M. Loud & Sons Lumber Co.*, 86 Mich. 541, 49 N. W. 575, 24 Am. St. Rep. 134; *Adams Min. Co.* v. *Senter*, 26 Mich. 73, 76; *Marlatt* v. *Levee Steam Cotton Press Co.*, 10 La. 583, 29 Am. Dec. 468; *Siebe* v. *Joshua Hendy Machine Works*, 86 Cal. 390, 391, 25 Pac. 14.) Even where the contract in question pertains to matters without the ordinary course of business, but within the power of the corporation—that is, such as is not prohibited by its charter or by express provision of law—the authority of the agent may be established by proof of the 'course of business between the parties themselves; by the usages and practice which the company may have permitted to grow up in its business; and by the knowledge which the board, charged with the duty of controlling and conducting the transactions and property of the corporation, had, or must be presumed to have had, of the acts and doings of its subordinates in and about the affairs of the corporation.' "

It is argued that the president of the bank, when making the above statement, was directing the course of litigation for the bank, and, therefore, acting within the implied powers of his office. (See 7 American Jurisprudence, 184; notes, 1 A. L. R. 704; 67 A. L. R. 978.) At the time the statement was made

the litigation was ended. Judge Bourquin so decided, and plaintiff relies on that decision. The alias writ of assistance was declared void because the court had exhausted its powers. Hence, that rule may not here be applied.

An attempt was here being made to gain possession of real estate which the bank had previously conveyed to others. The power of national banks to deal in, or own and hold, real estate is distinctly and definitely circumscribed by statute. (Sec. 29, Title XII, U. S. C. A.)

The statement in question here cannot be regarded as one pertaining to, or connected with, the ordinary business of a banking corporation. Before the evidence was admissible against the bank there should have been proof, aside from the declaration itself, of the authority of Marlow, as pointed out in the *Mayger Case,* supra. (Compare *Callahan* v. *Chicago, B. & Q. R. Co.,* 47 Mont. 401, 133 Pac. 687, 47 L. R. A. (n. s.) 587; *Raish* v. *Orchard Canal Co.,* 67 Mont. 140, 218 Pac. 655; *Louisa County Nat. Bank* v. *Burr,* 198 Iowa, 4, 199 N. W. 359; *Wilkin- Hale Bank* v. *Herstein,* 48 Okl. 628, 149 Pac. 1109, 1 A. L. R. 679; *Farmers' etc. Bank* v. *Cromwell,* 70 Okl. 199, 173 Pac. 826, 1 A. L. R. 684, and see note in 1 A. L. R. 700; *Hudson* v. *Phila- delphia Life Ins. Co.,* 152 Tenn. 691, 280 S. W. 403; *Weed* v. *Panama R. R. Co.,* 17 N. Y. 362, 72 Am. Dec. 474; Abbott's Trial Evidence, 4th ed., secs. 79 and 91; Elliott on Evidence, sec. 252.) There was no testimony in the case that the declaration of Mr. Marlow was ever communicated to the officers executing the alias writ of assistance, or that it was ever acted upon by anyone.

Plaintiff, however, seeks recovery of exemplary damages. Whether the declaration was admissible as against Marlow to show malice and intent as a foundation for exemplary damages need not be determined now since there was no appeal from the ruling as to Marlow. It was not admissible against the bank without some proof that he was acting within the scope of his authority for the bank when endeavoring to obtain possession of the property. This conclusion is not out of harmony with the case of *Klind* v. *Valley County Bank of Hinsdale,* 69 Mont. 386, 222 Pac. 439. There the bank was held liable in exemplary dam-

ages for the malice of its cashier in the wrongful taking of property claimed to have been taken under a chattel mortgage. In that case it was shown that West, the cashier, acted for the bank in taking the mortgage security and at the sheriff's sale in making purchase thereof. West himself testified that the defendant bank took charge of the cattle on Klind's premises, and he said the sheriff took charge of the cattle and that he, the sheriff, was acting for the Valley County Bank. The sheriff testified that he was acting at the request of West, or of the Valley County Bank. Here the officers stated that they were acting under the alias writ. That writ was obtained by the Mangers. The bank had sold the property to them under a bargain and sale deed, without any warranty of title, other than that implied from the use of the word "grant." The bank's connection with efforts to secure possession of the property was, aside from the objectionable testimony, shown to be through other agents than Marlow.

Plaintiff here contends that the attorneys of the bank were the agents of the bank in taking steps to obtain possession of the property. Aside from the declaration in question, Marlow was not shown to have any authority from the bank to do anything to obtain possession of the property. In the *Klind Case*, supra, West was shown to have had authority to act for the bank in taking possession of the property there involved. The *Klind Case* was decided upon the authority of *Grorud* v. *Lossl*, 48 Mont. 274, 136 Pac. 1069, wherein it was held that there was a presumption that the president of a corporation was acting for the corporation in instituting proceedings relating to the larceny of the corporation's property. That presumption cannot obtain here, where the efforts to obtain possession of the property had advanced to the point where legal steps had been taken to obtain possession and where, presumptively, the matter of obtaining possession had been placed within the hands of attorneys. Moreover, on the face of the record the Mangers were the ones interested in obtaining possession of the property in question, and, prima facie at least, the bank had no interest in that question, and the testimony tending to overcome these facts shows that the only ones who purported to act for the bank in taking possession, aside

from the declaration in question, were others than Marlow. The admission of this evidence was error.

Defendant next contends that since plaintiff was permitted to show her good faith by showing that she thought she had some interest in the property in question, it should have been permitted on cross-examination to elicit facts impugning her good faith, and, not being permitted to do so, that it was unduly restricted in her cross-examination. We think such cross-examination was unduly restricted, but that question could only be raised by the Mangers because it was their counsel alone who sought to cross-examine plaintiff. Counsel for defendant bank did not cross-examine her at all and is in no situation to complain of the court's action.

Error is predicated on the refusal of the court to permit defendant to show that the deed it executed to the Mangers was delivered. Since issue was raised by the pleadings on this point, defendant should be permitted on another trial to show delivery of the deed. Whether the court's refusal to admit this evidence, standing alone, would be sufficient ground for a new trial we need not now determine.

From what has already been said, it was also error to refuse defendant's offered Instruction No. D–5, to the effect that the fact that plaintiff paid part of the purchase price of the property in question did not create in her any legal title or right of possession of the lands or the dwelling house. It is contended that the error, if any, was cured by Instruction No. 18. That instruction advised the jury that any evidence proving or tending to prove title or ownership in plaintiff was received simply for the purpose of showing good faith on the part of plaintiff, and not to show ownership or right of possession. Instruction No. 18 was given without objection, and the record demonstrates that on the settlement of the instructions it was first offered and given. Thereafter defendant offered the proposed Instruction D–5, to which plaintiff objected, but not on the ground that the proposed instruction was covered by instructions already given. It was not urged in the lower court

that the two instructions covered the same subject, but it is here so argued.

What we have already said demonstrates that the proposed instruction should have been given. It states the law as applied to the facts in the case as we have declared it in this opinion. Instruction No. 18 was an abstract statement of the law. It left to the jury the determination as to which items of evidence they would apply the rule therein declared. Furthermore, the instruction clearly infers that evidence had been admitted which at least tended to prove, and perhaps would prove, that plaintiff was the then owner of some equitable interest in the premises. The jury, in considering this evidence under the instruction as given, might reasonably conclude that if plaintiff paid the purchase price, or some part of it, she then in fact had some interest in these lands and that she was entitled to their possession. Any layman understands that if he is the owner of property he is entitled to its possession. The harm in refusing to give the offered instruction is demonstrated by the fact that the measure of damages as against a mere possessor might be very different in amount from that to which a plaintiff in rightful possession might obtain. (*Hunter* v. *Hatton,* 4 Gill, (Md.) 115, 45 Am. Dec. 117.) On the contrary, the evidence failed to prove that she was then in possession under any lawful claim of ownership. The proposed instruction was specific and should have been given, and Instruction No. 18 does not cure this error. The failure to give the proposed instruction was error. The judgment is reversed and the cause remanded with direction to grant the defendant bank a new trial.

ASSOCIATE JUSTICES STEWART, ANDERSON and MORRIS concurring.

MR. CHIEF JUSTICE SANDS dissenting.

MR. JUSTICE ANGSTMAN, Dissenting:

In my opinion, the majority opinion announces incorrect statements of law leading to an erroneous conclusion. While

the authorities are not uniform on the question, the decided weight of judicial authority supports the view that where a wife advances money for the purchase of property the legal title to which is taken in the name of the husband, a resulting trust arises in favor of the wife and the transaction is not to be deemed a gift by the wife to the husband. The majority have announced the correct rule where the husband advances the money and title is taken in the name of the wife, but the same rule does not apply where the wife furnishes her separate funds for the purchase of property taken in the name of the husband. (Restatement of the Law of Trusts, section 442, and comments page 1356.) For cases recognizing the distinction, see the following: *Hinshaw* v. *Russell,* 280 Ill. 235, 117 N. E. 406; *Zeller* v. *Knapp,* 135 Cal. App. 122, 26 Pac. (2d) 704; *Mandelcorn* v. *Mandelcorn,* 228 Ala. 590, 154 So. 909, 93 A. L. R. 322; *Rhea* v. *Thomson,* 115 Cal. App. 466, 1 Pac. (2d) 1091; *Johnson* v. *Foust,* 158 Iowa, 195, 139 N. W. 451; *Gilbert* v. *Gilbert,* 180 Ark. 596, 22 S. W. (2d) 32; *Brooks* v. *Fowler,* 82 Ga. 329, 9 S. E. 1089; *Helvie* v. *Hoover,* 11 Okl. 687, 69 Pac. 958; and see cases listed in note in 43 A. L. R., p. 1433; *Walker* v. *Walker,* 2 Tenn. App. 279; *Stickney* v. *Stickney,* 131 U. S. 227, 9 Sup. Ct. 677, 33 L. Ed. 136; *Rhodes* v. *Peery,* 142 Or. 165, 19 Pac. (2d) 418.

Prior decisions of this court, while containing statements which seem to militate against this view, have never had this question directly presented.

In the case of *Clary* v. *Fleming,* 60 Mont. 246, 198 Pac. 546, where the rule contended for was first announced in general terms, the husband, not the wife, paid the consideration.

In *Humbird* v. *Arnet,* 99 Mont. 499, 44 Pac. (2d) 756, the main issue was one of fraud which the lower court found existed and which the supreme court sustained because there was supporting evidence. Moreover, the evidence in that case tending to show that the alleged *cestui que trust* advanced the money was unsatisfactory.

The case of *Bast* v. *Bast,* 68 Mont. 69, 217 Pac. 345, is also distinguishable, for there the issue was whether a judgment in

favor of the divorced wife in the sum of $3,900 was for a debt or for alimony. When that was determined the case was decided and the other statements relative to the presumption of a gift were in the nature of *dicta*.

The case of *Roman* v. *Albert*, 81 Mont. 393, 264 Pac. 115, turned upon a question of fraud. The court pointed out that the evidence of payment of money by the wife was vague and uncertain, and sustained the lower court's finding of fraud with the intent to defeat creditors. Here the evidence showing that Mrs. Bingham advanced the money was definite, certain and undisputed.

The case of *McLaughlin* v. *Corcoran*, 104 Mont. 590, 69 Pac. (2d) 597, was not one where the relationship between the person advancing the money and the holder of the legal title was that of wife and husband.

In none of the prior decisions of this court wherein it made the general statements relied upon here does it appear that the court was aware of the distinction recognized by the great weight of authority between the case where the wife, and not the husband, advances the money. Had the court been aware of this distinction and yet desired to disregard it, it would seem clear that it would have made some explanation for taking a view out of harmony with the decisions of other courts on the subject.

I believe it cannot be said that this court in any of its prior decisions has determined this question contrary to the views expressed by the great weight of authority. Prior to now it has never had the question pressed upon it for consideration. In all of the prior decisions this court simply made the general statement of the rule but did not rest the decision on that point.

I do not attach importance to sections 5782, 5784, 5790 and 5799, Revised Codes, cited in the majority opinion, for similar statutes are found in other states adopting the majority view. Neither do I see any merit in the suggestion that the majority rule was developed in some instance prior to the Married Woman's Acts. This cannot be so, for prior to the Married Woman's Acts the wife could hold no separate personal property of her own, and hence of necessity the question before us

never could have arisen. The reason for adopting a different presumption when the wife advances the money was to safeguard and conserve her property rights granted by the Married Woman's Acts and thus to carry out the letter and spirit of those Acts. There is as much reason for the rule today as there ever was.

Furthermore, if there were a presumption of gift in this case it was rebutted here, for there was evidence from which it could be inferred that, as between the husband and wife, the intention was to create a trust and not to regard the advancement as a gift from wife to husband. This intent is inferable from the fact that both advised the bank before signing the mortgage to the bank, that the wife owned a one-half interest in the property. (See Bogert on Trusts, sec. 459, note 47.) I think under the evidence here a resulting trust arose in favor of Mrs. Bingham, entitling her to a one-half interest in the property where the acts here complained of were committed. Neither is there an estoppel on her part because of laches in claiming her interest under the rule stated in *Clary* v. *Fleming*, 60 Mont. 246, 198 Pac. 546, for there never can be an estoppel by lapse of time where there never has been a repudiation of the trust by the trustee. (*Rhodes* v. *Peery*, supra; *Hofteizer* v. *Prange*, 45 S. D. 228, 186 N. W. 963; *Fawcett* v. *Fawcett*, 85 Wis. 332, 55 N. W. 405, 39 Am. St. Rep. 844.) Here the husband never repudiated the trust. Husband and wife both testified that the bank was informed of the wife's interest at the time the mortgage was executed by them jointly, and hence the bank took the property subject to the trust. (*First Nat. Bank of Sayre* v. *Sanders*, 169 Okl. 192, 35 Pac. (2d) 889; *Phelps* v. *Davies*, 126 Cal. App. 419, 14 Pac. (2d) 922.)

The wife's interest has never passed to the bank or to anyone else. In consequence it was not error to refuse to give defendant's offered Instruction No. D–5, because it was not a correct statement of the law.

I also think that the declaration of Mr. Marlow, president of the bank, was admissible and properly received. Counsel for the bank concede that it was admissible if the matter of obtain-

ing possession of the property involved was an affair of the bank. The record discloses that one of the officers who attempted to execute the alias writ stated to Mr. Bingham that "the bank had sent him out." Hence there was evidence aside from the declaration in question that the bank was actively participating in the matter of securing possession of the property, and, this being so, the declaration of the president was admissible as much so as was that of the cashier in the case of *Klind* v. *Valley County Bank of Hinsdale*, 69 Mont. 386, 222 Pac. 439. The fact that there was no proof that the president's statement was communicated to the officers executing the writ is immaterial, for it tended to prove malice which was imputable to the bank (*Grorud* v. *Lossl*, 48 Mont. 274, 136 Pac. 1069), and was material upon the issue of exemplary damages.

Other questions raised by defendant have been decided adversely to its contention by the majority opinion, and to that extent I agree with it. In my opinion the record does not present any reversible error. Accordingly, I think the judgment should be affirmed.

Rehearing denied October 6, 1937, MR. JUSTICE ANGSTMAN, dissenting.

MR. CHIEF JUSTICE SANDS, Dissenting from Order Denying a Rehearing:

This case was filed September 1, 1928. Various motions were filed and heard in the federal and state courts during the intervening time between the eviction completed on September 20, 1927, and the filing date of this suit concerning the property involved in the controversy between Mrs. Bingham and the bank. In fact, the records show that the litigation in its various phases has extended over eleven years. During most of this time Mrs. Bingham has been homeless. She, in her name, had about 175 blooded Hereford cattle, clear of mortgage, and several hundred acres of farm land, all clear of mortgage, and her husband had in his name about the same amount of property. Each had his or her own stock brand. Some of the land claimed

by them as tenants in common stood in the name of Frank H. Bingham, especially including the home comprising 160 acres.

Mrs. Bingham was not greatly indebted. She was apparently a good business woman. Her husband, on the contrary, was careless of his business affairs. The bank account with the National Bank of Montana was kept in his name. Most of the debts were with the bank, and the Binghams depended much upon the bank to account for their business affairs. In 1924 the bank demanded security and summoned the Binghams to the bank and, in conference with Thomas Marlow, its president, a controversy arose over the amount due the bank, all or most of which was then unsecured. Marlow claimed about $31,000. Finally, Mrs. Bingham testified, and the record does not show any testimony to the contrary, a settlement was made at $21,500, on the condition that she would sign a note for that amount and each of the Binghams should sign a mortgage on their respective properties. The real estate mortgage and note were made in one instrument.

In May, 1926, the bank again summoned the Binghams and demanded that they sell the ranch to Richard and Clara Manger for $20,000 in order to satisfy the mortgage indebtedness. The interest had been paid to date, but the bank claimed the bank examiner insisted upon a liquidation of the account. The Binghams claimed the land was worth more than $20,000, and refused to sell at that price. Thereupon the bank seized the mortgaged cattle under the chattel mortgages and sold them, crediting the proceeds as it saw fit.

A suit was brought to foreclose the real estate mortgage. Thereupon Bingham filed a petition in bankruptcy. The land standing in the name of Frank Bingham was sold in such proceeding to the bank for $8,250. The bank almost immediately resold to Richard and Clara Manger and while the Binghams were in possession. Mrs. Bingham refused to release possession. Thereupon a writ of assistance was issued out of the federal court under the bankruptcy proceedings. It was given to a United States marshal for service, he alleged, by the bank. Mrs. Bingham refused to recognize the writ, claiming that cer-

tain of the lands, including the home place, were in her husband's name as trustee, she having paid the purchase price therefor, thus entitling her to remain in possession as a tenant in common of the home place. Also she claimed that she was not a party to the bankruptcy proceedings and was not bound by any decree of the federal court or any writ of assistance issued therefrom. Upon service of the writ, Bingham removed from the premises but Mrs. Bingham refused to vacate. She locked the house and rode off with the officers, declaring that she was going to consult an attorney. None of the personal property was disturbed.

The marshal informed a man, declared to be a representative of the Mangers, that he was then by the marshal's order under the original writ placed in possession. They then all left the place together, Bingham and his hired man, Preston, remaining alone on the premises. Soon thereafter Bingham finally removed from the premises, he not thereafter asserting any personal rights in the property. The marshal filed a return on the writ as fully executed.

Upon application of the same attorneys, Spaulding for the bank, and an attorney representing the Mangers, an alias writ of assistance was procured. Mrs. Bingham was delayed by the sickness of her counsel, and did not return to the home until about the month of July. The interior of the house was undisturbed, and her chickens, sheep and other personal property had been in the care of Paul Preston, the hired man. No testimony appeared to show that her possession was disputed until August 29, when the deputy marshal again appeared and demanded possession under the alias writ of assistance. Mrs. Bingham refused to relinquish possession. The marshal left but returned in a day or two with several assistants, again demanding possession. Mrs. Bingham locked herself in the house, and upon her refusal to remove, the marshal and his men moved into the bunk house and trained their car lights on the windows of the house at night. Parties were by the marshal refused admission to the house, even her attorney on his second attempt to see her. Preston, her hired man, was not allowed to feed her chickens or

her sheep. She feared to leave the house to get food from a cellar and fresh water from a well near by. Preston was arrested at a distance from the house, handcuffed and brought up to the house in full view of Mrs. Bingham from a window. She was pregnant and after several days gave premature birth to a child while alone in the house. She had nothing but stale water in the house. Shortly after birth the child died. A day or so later her brother came to the house, and after she had screamed from an upstairs window that she had a dead baby up there, he forced his way in and found her in a delirious condition in a bed upstairs. A doctor was summoned and she was removed. Thereafter the officers took possession and removed her furniture.

A year later this suit was filed. Many dilatory motions were made. A verdict for $15,000 was rendered on December 27, 1935. This case was argued in this court May 19, 1937; re-argued June 17, decision rendered July 6, 1937, and motion for rehearing filed.

In the real estate foreclosure proceedings by the bank, suit was first filed by the bank in August, 1926, to collect an alleged balance of $10,566 and $1,000 attorneys' fees. Mrs. Bingham denied any balance was due from her to the bank. After two trials in this court (*National Bank of Montana* v. *Bingham*, 83 Mont. 21, 289 Pac. 162; s. c., 91 Mont. 62, 8 Pac. (2d) 554), it was finally determined that Mrs. Bingham had overpaid the note in a small amount, but judgment was not granted for the undetermined balance in her favor or for any attorney's fee. She has been homeless since the marshal took possession on September 20, 1927.

With this understanding of the case, I wish to express my dissent to the opinion of the court directing a new trial.

I first analyze the pleadings to determine the issues. The plaintiff alleges possession of a certain tract of land and unlawful removal by defendants. The defendants admit removal but deny that it was unlawful, and allege that the removal was made under an alias writ of assistance issued out of the federal bankruptcy court in the matter of the bankruptcy of Frank

Bingham. This plaintiff was not named as a party in that proceeding. The answer very definitely in several places alleges that the eviction was made under such writ *"and not otherwise."* The defendant bank is alleged to have been one of the parties directing and encouraging the eviction. Damages are demanded. The answer alleges, in addition to the above, a mortgage by Frank Bingham and Minnie Bingham, his wife, the plaintiff herein, but no foreclosure is alleged. Therefore no title may be claimed under the mortgage. The issues then are confined to three questions: First, the right of plaintiff to remain in possession and the validity of the alias writ; second, the identity of the parties liable for the alleged trespass, and third, the amount of the damages. As the verdict of the jury fixed the damages, that question need not be further considered. I believe this analysis of the pleadings will simplify the consideration of the case.

Section 6817, Revised Codes, provides: "Occupancy for any period confers title sufficient against all except the state and those who have title by prescription, accession, transfer, will or succession." Under this section occupancy or possession is equivalent to title and effectually shifts the burden of proof. Therefore, unless title is proven by defendant in a trespass case, the title of the possessor is established.

The defendant bank limited its defense of a right to eject Mrs. Bingham to the alias writ of assistance. No proof of any other right of entry was offered. A sale under the bankruptcy of Frank Bingham was alleged but it was apparent no sale of his property could affect Mrs. Bingham's property or her right of possession unless it be shown that she was claiming right of possession as the wife of Frank Bingham and not as an independent owner. The burden of overcoming her possessory right was upon defendant. The purchaser at the bankruptcy sale stands in no better position than Frank Bingham himself; she claimed she owned a half interest in the land which would give her a right of possession, but the right to acquire possession was, as said before, limited by defendant bank's answer to the alias writ. This writ was void on its face, as it appears from the

pleadings that the original writ had been served and by the allegations of the answer returned as fully executed. Therefore, if an alias writ is ever authorized, no legal reason existed for the issuance of this alias writ. Judge Bourquin, in a proceeding in the federal court to test the validity of this writ of assistance in which the defendant bank was a party, held that the writ was void *ab initio*. Thus, the facts stated by defendant made it void and the judgment of Judge Bourquin, binding on the bank, also made it void and therefore *functus officio*. No citations are necessary to show that no person, officer or other person can defend or claim any right under a void writ. No proof or argument in this case claims otherwise.

There is also another reason why the writ was ineffectual as a defense. Mrs. Bingham was not a party to the bankruptcy proceedings, and any right claimed by her to the property independent of her husband could not be foreclosed and she could not be dispossessed by the writ even if valid. The alias writ was, then, no defense to the eviction of Mrs. Bingham, and since the right of entry of defendant bank rested solely upon that defense, the trespass is established.

The plaintiff did not go further in her complaint than to allege possession in herself. If she attempted to go further and prove the good faith of her claimed possession, such unnecessary additional proof could not prejudice her already admitted possession. This court said in the majority opinion that title was not an issue in the case. The additional proof of the trust title could not be prejudicial to defendant. How could the jury or the defendant bank have been misled to its disadvantage? Defendant limited its proof of its right of possession to the void alias writ of assistance. There being no prejudicial error in admitting the proof of additional title and Instruction D-5 being an erroneous statement of the law, no error arose and the verdict and judgment should be sustained.

The argument over the question as to whether the payment of the purchase price of the home place, the title having been taken in the name of the husband, constituted a trust or a gift, is deemed as a controlling feature by my associates. The failure

to give the Instruction D–5 is held to be the principal reason for granting the new trial. My view of the pleadings and the issues presented at the trial, as stated before, renders this issue wholly immaterial. It was surplusage. If Mrs. Bingham offered to prove that she held possession in good faith, it was proper but unnecessary proof. No prejudicial error arose therefrom. The rejected instruction did not correctly state the law as clearly explained in the dissenting opinion of Mr. Justice Angstman. The original majority opinion held that other states upheld the contention that the title in the husband, where the purchase price was furnished by the wife, constituted a gift. The decision now holds that the weight of opinion is the other way, but the decisions of this court are with the minority, citing three cases in support of that contention. A careful reading of these three Montana decisions should convince any lawyer that the claimed holdings are merely *dicta,* mere random, careless statements of a general principle in no way applicable to the issues or facts in the instant case, and by no stretch of imagination can they be held to establish the alleged gift, in principle, in any one of the cases. They are cited in the majority and minority opinions and should be read by every lawyer interested in the justice of this case. It is a feigned technicality urged by the four attorneys for a million-dollar corporation to bolster a case that reeks with injustice from its inception. The statute on the subject of trusts (sec. 6785, Rev. Codes) is so plain that no one can misunderstand, and no court has any authority to add exceptions to a plain statute, at least not where such exceptions are not warranted by reason or necessity. I say, therefore, that rejected Instruction D–5 could not afford a ground for reversal. No testimony was suggested or offered by defendant to counteract the effect of the testimony of the good faith of the possession of Mrs. Bingham.

The court holds in its decision that the means used to dispossess Mrs. Bingham were excessive and not justified by the exigencies of the case, and for that reason the defendants were further liable as trespassers. I heartily concur with that conclusion.

The next question and, perhaps, the most important is: Who is liable for the proven trespass? The undisputed proof is that the bank, through its president, Thomas Marlow, sold the property to Richard and Clara Manger, and gave a bargain and sale deed for it. The deed provided that the bank "granted" to the Mangers the property described, including the particular property involved in this controversy. The statute, section 6874, Revised Codes, defines the word "grant" as used in deeds, as follows: "From the use of the word 'grant' in any conveyance by which an estate of inheritance or fee simple or possessory title is to be passed, the following covenants, and none other, on the part of the grantor for himself and his heirs to the grantee, his heirs and assigns, are implied, unless restrained by express terms contained in such conveyance: 1. That previous to the time of the execution of such conveyance, the grantor has not conveyed the same estate, or any right, title, or interest therein, to any person other than the grantee. 2. That such estate is at the time of the execution of such conveyance free from encumbrances done, made or suffered by the grantor, or any person claiming under him. Such covenants may be sued upon in the same manner as if they had been expressly inserted in the conveyance."

It was provided that the grantee should "*have* and hold" the said premises. The bank had the unquestioned right to sell the interest of Frank Bingham in this property and deliver such a deed to the purchaser, executed as it was by its president, Marlow. It would be the duty of the bank in selling the property to deliver possession to the purchaser. When the Mangers found that Mrs. Bingham refused to give possession they complained to the bank. As the present title owners, the Mangers were the only persons that could apply to the federal court for a writ of assistance. The bank was the real party in interest. The Mangers were only the nominal parties.

The officer who attempted to enforce the original writ testified that the "bank sent him out." This alone was sufficient to connect the bank with the trespass, but the cashier of the bank also testified that the bank was interested because it felt it

its duty to furnish possession to the Mangers. Further testimony showed that the bank paid at least some of the expenses of acquiring the possession, and Marlow paid Mrs. Bingham's doctor bill; he solicited the doctor to go and see her.

This court found that the admission of the testimony wherein Marlow was alleged to have directed Angell, the alleged attorney for the Mangers, to get Mrs. Bingham off the land "dead or alive," (to which testimony no proper objection was made by the bank) was error in that Marlow was not shown to have authority to give any such direction. Marlow, as president of the bank, executed the deed. Surely he was acting within his authority in selling the property. As said before, it was the bank's duty, after selling the property, to place the Mangers in possession, and Marlow having properly and within his authority negotiated the transaction, was most certainly justified in attempting, for the bank, to fulfill the duty of the bank in placing the Mangers in possession.

An officer charged with the duty of starting a proper proceeding for the bank would certainly be presumed to have authority to finish the transaction, and, having started on the road, if he deviated from the exact direction expected by the bank and damages arose therefrom, the bank would not be excused by asserting that he did not fulfill its direction as expected. Certainly it would be unjust to place the burden of showing that he did not exceed his authority upon the Mangers. And most certainly it was not the duty of Mrs. Bingham to define the authority of Marlow, the managing agent of the bank. It is very questionable whether the bank could show that Marlow deviated from the course expected, but certainly Mrs. Bingham would not be required to show what his authority in the matter was, after it appeared that he properly executed the deed.

The defendant claims that fifty errors were made in the trial of the case. It surely appears that several errors, as, for instance, the dismissal of the case against Marlow, were made against the plaintiff, but I fail to see from a careful reading of the transcript or the errors pointed out by the court, wherein any prejudicial errors were made against the bank. Therefore

the decision requiring a new trial is a serious hardship upon the plaintiff. The hardship is emphasized when we note that this case has been in court for more than nine years; that this woman was driven from her home by persons directed by the bank, without any showing whatever on the part of the bank as to a right to the property. To put the plaintiff back to the same place where she was nine years ago would certainly be an injustice against which I protest.

In conclusion I venture the following observations as pertinent to this case: As stated heretofore, the case was in the district court over seven years and in this court a little less than two years. Section 6, Article III of the Constitution of Montana provides: "Courts of justice shall be open to every person, and a speedy remedy afforded for every injury of person, property, or character; and that right and justice shall be administered without sale, denial, or delay." Section 2 of Article VIII provides that the supreme court shall have "appellate jurisdiction" and "a general supervisory control over all inferior courts." The fact that it has taken nine years and more for Mrs. Bingham to get back to where she started nine years ago does not encourage other would-be litigants to seek redress in the courts of Montana. It will be urged that the attorneys in the case were chiefly to blame for the delays. As this court is the general supervisory authority over all inferior courts—and that would include the attorneys as well—this court is in a position where it cannot shift the entire responsibility for the long delay to the attorneys and the district judge or judges, as the case may be.

As Chief Justice, I take this opportunity to give notice that some means of supervision will be found, if I can have my way, to prevent the repetition of such delays. It may reach out to the courts or to the attorneys. I will not leave such a record of delay behind me if I can help it. This threat will not be popular with the attorneys but it will please their clients, particularly the private litigants who want their rights preserved while they still live. The corporations do not generally want speed. They do not die except voluntarily. May I inquire

what delays would have ensued if the parties had been reversed in this case? Did not the bank corporation have an influence in delaying this case? Will it take nine years to get another trial? Mrs. Bingham surely has cause to complain of Montana courts, and I accept my part of her condemnation with my humble apology, if that will do her any good.